UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

**07CV2170**
**JUDGE PALLMEYER**
**MAGISTRATE JUDGE COLE**

ILENE SIEMER,
FLYING SQUIRREL, INC.,
CHARLES GRACHAN,
GRACHAN ENTERPRISES, INC.
HENRY KUSZTELAK,
UNCLE HENRY, INC.,
SONIA BRAR,
RICK BRAR,
BRAR MANAGEMENT LLC,
NORMAN COHEN, and
SUPER SUBS OF GURNEE, INC.,

CIVIL ACTION NO. _____

**FILED**

APR 19 2007
APR 19 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

vs.

THE QUIZNO'S FRANCHISE COMPANY LLC,
QUIZNO'S FRANCHISING LLC,
QUIZNO'S FRANCHISING II LLC,
THE QUIZNO'S MASTER LLC,
QFA ROYALTIES LLC,
QZ FINANCE LLC,
QIP HOLDER LLC,
TQSC LLC,
CERVANTES CAPITAL LLC,
RICHARD E. SCHADEN,
RICHARD F. SCHADEN,
SCOTT MORTIER,
ADAM GOLDFARB,
DAVID GOLDBERG,
CARL CURATOLA,
DOMINICK VOSO, and
STEVE ELLER,

Defendants.

**CLASS ACTION COMPLAINT**

The Plaintiffs, individually and on behalf of all others similarly situated, allege by and through their attorneys, Marks & Klein, LLP and Kravit, Hovel & Krawczyk S.C., as follows:

## NATURE OF CASE

1.      This is a class action brought by Illinois franchisees of the Quiznos toasted submarine sandwich shop restaurant chain arising from the illegal business scheme of Quiznos and its web of affiliated entities and individuals who control and operate the Quiznos franchise system (collectively the "Defendants" or "Quiznos").   Through this scheme, Defendants fraudulently induced Plaintiffs and the Class to purchase franchises and thereafter exploited their control and economic power in order to extract exorbitant and unjustifiable payments and expenditures from their franchisees.   As a result, Defendants reap grossly inflated sales and profits, creating an illusion of corporate growth and business prosperity while causing substantial financial harm to existing franchisees.

2.      Quiznos' illegal scheme consists of two primary components.   First, Quiznos engages in a policy of fraudulently and deceptively inducing franchisees to purchase Quiznos franchises by intentionally misrepresenting the true nature of the contractual relationship as well as the financial prospects for the franchise and likelihood of success. Quiznos takes further advantage of its franchisees through other illegal, deceptive and fraudulent means, including but not limited to its willful practices of: (a) saturating geographic areas with more franchises than the areas could reasonably support; (b) selling franchises in defined "trade areas" which are in fact arbitrarily defined by Quiznos without it having conducted any reasonable research into whether such trade areas can support even one Quiznos franchise, let alone the multiple franchises that Quiznos sells in a given trade area; and (c) enforcing biased and discriminatory policies, procedures and practices (not applied equitably to all franchisees) for inspections and alleged "operational standards" designed to deliberately decrease or eliminate Quiznos

2

obligations to compensate franchisees for their purchase of various mandated products, while concurrently creating an environment designed to keep outspoken franchisees "in-line" and "towing the line" regarding Quizno's unfair, unethical, and deceptive business practices.

3.     Second, Quiznos exploits the overwhelming economic power it holds over its franchisees by creating a captive artificial consumer market, comprised of all of its franchisees, for products and services that Quiznos requires to begin and continue the operation of a Quiznos franchise.  While concealing the full nature of its own relationships with suppliers from potential franchisees, Quiznos uses its exclusive control over the franchise system to, among other things, force its franchisees to: (a) purchase unneeded goods and services; (b) purchase needed goods and services in amounts far greater than necessary to meet the operational needs of their franchises; (c) work with Quiznos-mandated suppliers and pay to those suppliers excessive prices for goods and services that bear no relation to those that could be achieved in arm's length transactions; (d) accept coupons from customers for free or highly-discounted food items for which franchisees receive no reimbursement from Quiznos and which therefore benefit Quiznos by increasing its sales while causing franchisees to purchase more food products for which they receive literally no compensation; and (e) pay a 4-5% "advertising fee," which Quiznos, in violation of its franchise agreements and representations in its various Uniform Franchise Offering Circulars ("UFOCs"), uses for self-serving purposes, including selling more franchises to unwitting consumers and, moreover, improperly allocates advertising funds for purposes outside the accepted and defined use of the fees.  Quiznos' conduct inherently raises a conflict of interest that routinely results in it choosing its own interests over those of its franchisees. As such, Defendants' day-to-day activities in relation to their franchisees also violate the implied covenant of good faith and fair dealing inherent in plaintiffs' franchise agreements.

4.     The fraudulent intent underlying Quiznos' scheme of deceptively luring franchisees to participate in its system and thereafter extracting supra-competitive prices and kickbacks is demonstrated by its pattern of behavior when the inevitable franchise failures come to pass. Quiznos maintains a policy by which it manipulates its unfair agreements to administer the coup de grace to franchisees when, after the franchisee can no longer bear the ruinous losses caused by Quiznos' exploitation, the franchisee goes out of business only to face the initial threat of a lawsuit by Quiznos to enforce provisions of the franchise agreement that purport to make franchisees legally liable for payment of royalties over the entire 15-year term of the agreement, even though the franchisee has been forced out of business due to Quiznos' fraudulent, deceptive and illegal scheme to increase its revenues and profits at the expense of its franchisees. While threatening the "stick" of a lawsuit to recover the present value of 15 years' worth of royalties, Quiznos then seeks a signed, unconditional waiver of all rights from the franchisee, in effect to prevent the franchisee from later seeking any redress against Quiznos.  In addition, Quiznos takes advantage of failed store locations to facilitate the movement of a lengthy list of equally deceived franchisees awaiting store locations, into the same, now-vacant and bankrupt locations. In the process, they are creating second-generation (and, in some cases, third-generation and fourth-generation) franchisees with lower entry costs, as the new franchisees purchase the recovered equipment of the defunct franchisee, with Quiznos' assistance, from the lien-holding bank at pennies on the dollar.  In this manner, Quiznos suffers no loss and only a short-term interruption in royalties, while also meeting its obligation to provide locations to the excessive backlog of franchisees.  Then, having secured the store in the hands of a new and unwitting franchisee, Quiznos executes the same scheme against the new owner—actions geared to continue the illegal scheme of increasing revenues on the backs of those with no control.

5. Plaintiffs bring this action alleging violations of: (a) the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c); (b) Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, by reason of Defendants' violation of the Sherman Act, 15 U.S.C. § 1; (c) the Illinois Franchise Disclosure Act of 1987 ("ILFDA"), 815 ILCS §.705 *et seq.*; (d) the Illinois Antitrust Act, 740 ILCS § 10/1 *et seq.*; (e) the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505 *et seq.*; and (f) claims of common law fraud, breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs seek declaratory and injunctive relief, as well as damages, to remedy Defendants' unconscionable, fraudulent, unlawful and .anticompetitive practices in connection with the operation of its franchising scheme.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the Plaintiffs' claims brought under RICO and the federal antitrust laws pursuant to 28 U.S.C. § 1331. This Court may also exercise supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over each Defendant because the Defendants were engaged in an illegal, fraudulent and anticompetitive scheme that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in the State of Illinois and throughout the United States. In addition, Defendants engaged in solicitation and service activities within this state or caused persons on their behalf to do so. Personal jurisdiction is also vested because this case is predicated on contracts for services to be rendered or for materials to be furnished in the state by the defendant.

8. Venue is proper in this Court pursuant to the nationwide venue provisions of RICO, 18 U.S.C. § 1965(a) and (b). Alternatively, venue is proper in this Court pursuant to 28

U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims of the Plaintiffs occurred in this judicial district.

## PARTIES

9.      Plaintiff Ilene Siemer ("Siemer") is a resident of the State of Illinois, with her home address at 1017 N. Wood Street, Chicago, Illinois 60622. On October 13, 2003, Siemer executed a Franchise Agreement for the operation of Quiznos Store No. 6224, located at 2300 North Lincoln Ave., Chicago, Illinois 60614. Siemer actually executed the document before that date and post-dated the Franchise Agreement on the advice of Defendant Scott Mortier. Defendant Mortier asked her to do so, because he gave her the legally-required UFOC on that day and he knew it was a violation of law to obtain Plaintiff Siemer's signature without allowing her to review the UFOC.

10.      On March 22, 2004, Siemer formed an Illinois corporation called Flying Squirrel, Inc. ("Flying Squirrel"), which has its principal place of business at 2300 North Lincoln Ave., Chicago, Illinois 60614, and through which she operates the franchised Quiznos restaurant business referenced in the preceding paragraph. Flying Squirrel is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

11.      Plaintiff Charles Grachan ("Grachan") is a resident of the State of Illinois, with his home address at 21058 Alicia Court, Lockport, Illinois 60441. On April 20, 2004, Grachan executed a Franchise Agreement with Quiznos. Grachan also signed a separate Franchise Agreement for another Quiznos franchise, which he has been unable to open. Grachan operates Quiznos Store No. 2705, located at 4704 W. Lincoln Hwy., Matteson, Illinois 60443.

12.      Plaintiff Grachan Enterprises, Inc. ("Grachan Enterprises") is an Illinois corporation, which has its principal place of business at 4704 W. Lincoln Hwy., Matteson,

Illinois 60443, which was formed by Grachan to operate the franchised Quiznos restaurant business referenced in the preceding paragraph. Grachan Enterprises is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

13.     Plaintiff Henry Kusztelak ("Kusztelak") is a resident of the State of Illinois, with his home address at 1520 West Sand Bar Court, Unit 1G, Round Lake Beach, Illinois 60073. On July 8, 2004, Kusztelak executed a Franchise Agreement for the operation of Quiznos Store No. 1939, located at 254-2 East Rollins Road, Round Lake Beach, Illinois 60073.

14.     On June 23, 2004, Kusztelak formed an Illinois corporation called Uncle Henry, Inc. ("Uncle Henry"), which has its principal place of business at 254-2 East Rollins Road, Round Lake Beach, Illinois 60073, and through which he operates the franchised Quiznos restaurant business referenced in the preceding paragraph. Uncle Henry is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

15.     Plaintiffs Rick Brar and Sonia Brar (the "Brars") are husband and wife, who are residents of the State of Illinois, with their home address at 5N 523 East Lakeview Circle, St. Charles, Illinois 60175. On May 10, 2001, the Brars executed two (2) Franchise Agreements for the operation of Quiznos Stores No. 2436 and 2437, respectively. Store No. 2437 was located at 619 Martingale Road, Schaumberg, Illinois 60173. Store No. 2436 never opened.

16.     On December 28, 2001, the Brars formed an Illinois corporation called Brar Management LLC ("Brar Management"), which had its principal place of business at 619 Martingale Road, Schaumberg, Illinois 60173, and through which they operated the franchised Quiznos restaurant business referenced in the preceding paragraph. Brar Management is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful

7

conduct of Quiznos as alleged herein. The Brar Plaintiffs did not receive a UFOC prior to being asked by Defendants to execute the Franchise Agreement.

17.     Plaintiff Norman Cohen ("Cohen") is a resident of the State of Illinois, with his home address at 509 Exeter, Vernon Hills, Illinois 60061. In May 2002, Cohen executed a Franchise Agreement for the operation of Quiznos Store No. 1947, located at 7105 Grand Ave, Gurnee, Illinois 60031.

18.     On May 17, 2002, Cohen formed an Illinois corporation called Super Subs of Gurnee, Inc. ("Super Subs"), which has its principal place of business at 7105 Grand Ave, Gurnee, Illinois 60031, and through which he operates the franchised Quiznos restaurant business referenced in the preceding paragraph. Super Subs is a proper party plaintiff to this action because it has suffered losses as a result of the unlawful conduct of Quiznos as alleged herein.

19.     Defendant The Quiznos Franchise Company LLC ("TQFC") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQFC, in its own right and as the successor to the rights and liabilities of The Quizno's Corporation and The Quizno's Franchise Company, was the franchisor for Quiznos franchises granted prior to July 2002. Defendant TQFC does transacts business within Illinois and is amenable to personal jurisdiction in Illinois.

20.     Defendant Quiznos Franchising LLC ("QF") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QF was the franchisor for Quiznos franchises granted between July 2002 and February 2005. Defendant QF transacts business within Illinois and is amenable to personal jurisdiction in Illinois.

21.    Defendant Quiznos Franchising II LLC ("QFII") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. QFII was the franchisor for Quiznos franchises granted in and after February 2005. Defendant QFII transacts business within Illinois and is amenable to personal jurisdiction in Illinois. Upon information and belief, QFII has succeeded to the majority, if not all, of the rights and obligations of the various Quiznos defendants identified in this Complaint.

22.    Defendant The Quizno's Master LLC ("TQM") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. TQM owns the Quiznos intellectual property, including without limitation trademarks, copyrights, and purportedly confidential information, used by the various Quiznos entities in their operation and control of the Quiznos franchise system. TQM was at certain times material the parent of TQFC and an affiliate of QF. Defendant TQM transacts business within Illinois and is amenable to personal jurisdiction in Illinois.

23.    Defendant QFA Royalties LLC ("QFA") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005 the owners of the Quiznos entities identified in this Complaint and of other related or affiliated Quiznos entities engaged in a series of transactions that, after the transactions were completed, left QFA as the franchisor for all Quiznos franchise agreements entered into before February 2005. Defendant QFA transacts business within Illinois and is amenable to personal jurisdiction in Illinois.

24.    Defendant QZ Finance LLC ("QZF") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, QZF succeeded to various rights and liabilities of TQFC and QF in

or about February 2005. Defendant QZF transacts business within Illinois and is amenable to personal jurisdiction in Illinois.

25.     Defendant QIP Holder LLC ("QIP") is a Delaware limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, as of February 2005, QIP succeeded to certain rights and liabilities of TQFC, QF, TQM and/or QZF related to the franchises identified in this Complaint. Defendant QIP transacts business within Illinois and is amenable to personal jurisdiction in Illinois.

26.     Defendant TQSC LLC ("TQSC") is a Colorado limited liability company with its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. Upon information and belief, QFII and QFA have delegated their rights, duties and obligations as franchisor under Quiznos franchise agreements in the United States to TQSC for performance. Defendant TQSC transacts business in Illinois and is amenable to personal jurisdiction in Illinois.

27.     Defendant Cervantes Capital LLC ("Cervantes") is a Colorado limited liability company with its principal place of business at 1515 Arapahoe Street, Tower One, 10th Floor, Denver, Colorado 80202. At certain times material, Cervantes maintained its principal place of business at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202. The Registered Agent for Cervantes is Patrick E. Meyers, the recently replaced General Counsel for Quiznos. Upon information and belief, Cervantes Capital employs and pays Defendants Rick Schaden and Dick Schaden, as well as other top executives involved in decision-making for the Quiznos franchise system and various Quiznos entities, fees to Cervantes to have Cervantes and its employees run the Quiznos franchise system. In addition, upon information and belief, Cervantes owns or controls American Food Distributors, LLC and/or various affiliates thereof; CLG Leasing LLC; and Source One Distribution, LLC, among other supply companies from whom Plaintiffs and

other Quiznos franchisees throughout the United States are required to purchase food products and other supplies for use in their franchised Quiznos restaurants, as well as other "captive" supply companies with which Quiznos requires Plaintiffs and other Quiznos franchisees to do business. Cervantes does substantial business within Illinois and is amenable to personal jurisdiction in Illinois.

28. Defendant Richard E. Schaden ("Rick Schaden") is a citizen of Colorado who resides at 10563 E. Gooschaven Drive, Lafayette, Colorado 80026. Rick Schaden is, upon information and belief, the Chief Executive Officer of QFII, and upon information and belief, holds officer and director positions with one or more of the other Quiznos entities named as Defendants herein.

29. Defendant Richard F. Schaden ("Dick Schaden") is a citizen of Colorado who resides at 9596 Jeffco Airport Avenue, Westminster, Colorado 80021. Dick Schaden is, upon information and belief, an officer and/or director of one or more of the Quiznos entities named as Defendants herein.

30. Defendant Adam Goldfarb ("Goldfarb") is a citizen of the State of Illinois. Upon information and belief, Goldfarb worked in Quiznos' Real Estate department. Goldfarb made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Goldfarb acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

31. Defendant David Goldberg ("Goldberg") is a citizen of the State of Illinois. Upon information and belief, Goldfarb worked in Quiznos' Real Estate department. Goldberg made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Goldberg acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

32.    Defendant Carl Curatola ("Curatola") is a citizen of the State of Illinois. Upon information and belief, Curatola is a Quiznos' Construction Manager. Curatola made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Curatola acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

33.    Defendant Scott Mortier ("Mortier") is a citizen of the State of Illinois. Upon information and belief, Mortier was a Quiznos' Area Director and handled matters concerning new franchisees in Illinois. Mortier made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Mortier acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

34.    Defendant Steve Eller ("Eller") is a citizen of the State of Illinois. Upon information and belief, Eller was a Quiznos' Area Director. Eller made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Eller acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

35.    Defendant Dominick Voso ("Voso") is a citizen of the State of Illinois. Upon information and belief, Voso was a Quiznos' Area Director. Voso made representations and omissions to some of the Plaintiffs both before and after they signed their Franchise Agreements. At all times material, Voso acted as the agent and representative of Quiznos, such that his conduct is attributable to one or more of the Defendants.

36.    In this Complaint, the term "Quiznos" refers to the web of affiliated companies, corporations and limited liability companies that, acting together or separately, control and manage the business of the Quiznos franchise system.

## GENERAL ALLEGATIONS

37.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

### Quiznos' Unsustainable Business Plan

38.    Quiznos has been in business since 1981 and in 1991 began operating a system of franchised toasted submarine sandwiches and offering franchises for sale to members of the public across the United States, including Illinois.

39.    From 1994 through 2001, Quiznos operated as a publicly-traded entity.  In 2001, Quiznos was taken private by Rick Schaden, Dick Schaden, certain other members of the Schaden family, and others known and unknown (collectively the "Schaden Ownership Group"), who together owned a majority of the shares.

40.    Although 95% of the non-Schaden "outsider" shareholders objected to the going-private transaction, the Schaden Ownership Group used its majority control to force the sale of the minority shareholder interests at $8.50 per share.

41.    Dissenting minority shareholders brought a civil action in Colorado challenging the fairness of the price they received for their shares, and the court ultimately determined that the fair market value of the minority interests was $32.50 per share (almost four times more than the Schaden Ownership Group had paid for the shares).  The court also determined that the $8.50 per share valuation had been established in bad faith.

42.    After the completion of the going-private transaction in 2001, Quiznos adopted a strategy of rapid growth of its franchise system, and at the same time adopted methods of increasing revenues by forcing franchisees to pay ever-higher costs for food supplies and other products from Quiznos-affiliated companies or Quiznos-approved suppliers.  These measures have been adopted to inflate Quiznos' profitability and make it more attractive to potential

buyers and investors, toward the ultimate goal of allowing the Schadens and other Quiznos insiders to sell their ownership interest for billions of dollars.

43.     In or about April 2006, Quiznos sold an undisclosed stake in the company to the investment firm JP Morgan Partners and/or an affiliate of JP Morgan Partners (collectively "JP Morgan"). Upon information and belief, Quiznos sold JP Morgan Partners a 49% share of Quiznos for approximately $585 million, with JP Morgan having the opportunity to purchase the remainder of the shares still held by the Schadens Ownership Group at a specified time and for a specified price if certain conditions are met.

44.     For Quiznos to complete the sale of itself to JP Morgan, it must maintain and even improve the financial results, including substantial revenue growth, it has experienced over the last several years. To that end, Quiznos has continued and even enhanced a number of deceptive and fraudulent practices with respect to its franchisees that allow it to extract millions upon millions of dollars from the franchisees, while simultaneously making it difficult if not impossible for most Quiznos franchisees to operate profitably.

**Quiznos' Fraudulent Misrepresentations to Franchisees**

45.     At the same time Quiznos solicits new franchisees to enter into unconscionable and burdensome franchise agreements, it engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate a franchise that Quiznos knows, or should reasonably know, will in all likelihood fail.

46.     Quiznos touts itself as one of the fastest-growing Quick-Service Restaurant ("QSR") franchise chains in the United States. Over the last several years, the number of franchised outlets claimed by Quiznos has risen dramatically, from approximately 1,500 at the beginning of 2003 to over 5,000 as of the filing of this action. A continued rapid increase in the

14

number of Quiznos franchises sold is an important element in Quiznos' strategy of continuing to experience substantial growth in revenues.

47. Upon information and belief, when dealing with prospective franchises, Quiznos under-reports its closure rates, does not report its true turnover rates, and does not identify that the vast majority of its existing franchisees are single store owners, in a deliberate effort to conceal and prevent prospective franchisees from obtaining information that would educate them as to the true risks involved in this franchise venture, the potential for loss of a franchisee's invested capital, and the lack of opportunity to become a successful multi-store franchisee (the very concept of franchising from a franchisee perspective).

48. At the same time Quiznos was inducing Plaintiffs and others to invest its franchise system, it concealed the fact that the company was unable to support that system. For example, in a document dated December 12, 2003 prepared on Quiznos behalf by Fredric Cohen, Esq., Quiznos' attorney, Quiznos claimed that "40% of Quiznos units are not breaking even (Meyers (5/5/03) 65:23-66:1)." This material fact was never (and has never been) disclosed to any of the Plaintiffs despite Quiznos' knowledge of it. Moreover, as of December 31, 2006, the Quiznos system included 2,653 signed franchises that had not opened a location; 72.5% of those franchises (1,925 of them) had not opened within the required 12 months after signing and therefore may be terminated. During that same year, there were 571 transfers, 390 cancellations or terminations, and an additional 402 franchisees left the system. While not expressly stated in its UFOC, Quiznos' turnover rate in 2006 was an astounding 30%, which is more than three times the industry standard.

49. Further, during required corporate training for new franchisees, Quiznos represents through the use of inaccurate and deceptive graphs, charts and related calculations that within five years, a Quiznos location would be debt free and maintain a substantial resale value.

Based upon these deceptive figures, Quiznos encourages and induces existing franchisees to purchase multiple locations, before they can become aware of the true lack of profitability resulting from Quiznos' fraudulent policies and practices.

**Quiznos' Unconscionable and Unenforceable Franchise Agreements**

50.     Based upon the misrepresentations stated throughout this Complaint, Quiznos exploits its overwhelming bargaining power to require the franchisees to sign unconscionably one-sided adhesive franchise agreements, without any potential for negotiation of their terms.

51.     These misleading and deceptive franchise agreements purport, among many other things, to give Quiznos unilateral control over all significant aspects of franchisee operations, to unreasonably truncate any statutes of limitation that may apply to franchisees' legal claims, to disclaim any responsibility for the effect of Quiznos' decisions and actions on the franchisees' viability, and to restrict the ability of franchisees to litigate in their home states, to join with other franchisees to press claims, and to enjoy their Constitutionally-guaranteed right to a jury trial.

52.     The terms of the agreements, and their "Operations Manual" (which Quiznos routinely updates and uses as an extension of the franchise agreement in order to expand upon the terms of the original agreement), are in combination so burdensome on franchisees and so one-sided in favor of Quiznos that they can only be regarded as unconscionable and unenforceable. The net effect on Quiznos' franchisees of its approach to franchising is to ensure unconscionably overbroad contracts that purport to circumvent meaningful legal rights belonging to the franchisee, impenetrable systemic barriers to economic success for the franchisee, and negative incentives to pursue legal remedies to redress injuries caused by Quiznos' conduct.

**Quiznos' Policy of Extracting Unlawful Profits From Its Franchisees**

53.     Once the franchisees are ensnared in the Quiznos' scheme, Quiznos defrauds them through tying the franchisees' use of the Quiznos trademark and right to participate in the

franchise system to the supply of food products, supplies, services, and other things necessary for operation of the franchised restaurants ("Essential Goods").

54.     The franchise agreements provide that the franchisee must "purchase all equipment, products, services, supplies and materials required for the operation of the Restaurant from manufacturers, suppliers or distributors designated by Franchisor or its affiliates." These products include fungible staple food items such as meat, cheese, and condiments, as well as services such as Muzak and cash register system leases.

55.     Quiznos franchisees enter into their franchise agreements with limited and deceptive information regarding the nature of these tying policies. The agreements contain a provision allowing the use of "undesignated" suppliers with Quiznos' approval, but this provision is meaningless and misleading because such approval is rarely, if ever, granted. Moreover, the very process for alternate-supplier approval is deliberately vague, complex and with no timelines for approval, and as a result Quiznos frequently never even responds to franchisees' requests for such approval, or fails to provide any reasonable explanation for disapprovals.

56.     After locking franchisees into the system, Quiznos exploits its unilateral control over the purchases that franchisees must make in two principal ways. First, with respect to Essential Goods that Quiznos or one of its affiliated corporations such as American Food Distributors LLC and Continental Leasing LLC sells directly and/or through their suppliers or distributors to franchisees, Quiznos charges prices for those Essential Goods that Quiznos knows to be higher than franchisees could obtain for products, materials and services of equal or even higher quality from independent third-party vendors in a competitive market. This practice results in Quiznos and/or its affiliated companies reaping revenues and profits greatly in excess of what they would be if franchisees were not bound to buy from Quiznos at the peril of being

17

deemed in default and losing their franchise if they don't. Second, Quiznos requires franchisees to purchase certain Essential Goods that are sold by Quiznos-approved vendors, in which Quiznos maintains a financial interest. It is Quiznos' policy in such cases to require that independent suppliers, as a condition of becoming an approved source of products, services or materials to Quiznos franchisees, pay kickbacks to Quiznos, which are euphemistically termed "rebates" by Defendants. Quiznos requires approved vendors/distributors to pass along the cost of the kickbacks to its franchisees, resulting in the franchisees' being required, once again, to pay prices for products, services and materials that are higher than franchisees could obtain from independent third-parties in a competitive market.

57. Through its "rebate" scheme, Quiznos and companies and individuals affiliated with it reap substantial revenues and profits that come at the direct expense of its franchisees. This deliberate coercion, carried out using threats and intimidation, creates an environment where franchisees and their invested capital are preyed upon as the most important, immediate and dependable source of revenue and cash flow for the franchisor, with little concern demonstrated by the franchisor regarding the franchisees' positive cash flow generated through the sale of the franchisor's actual food products, even though these products are purported by the franchisor to be their primary business interest, but in fact are not. Moreover, once franchisees become aware of this fraudulent scheme, the sunk costs, onerous contractual provisions, and costs of switching to another franchisor make it economically prohibitive to escape the 15-year Quiznos franchise agreement, thus finding themselves in long-term indentured servitude.

58. Even after signing the franchise agreement, as a condition of franchisee ownership, Quiznos requires franchisees to sign supplemental contracts for franchisor-mandated services. These contracts are equally one-sided, favoring Quiznos, and designed to prevent the prospective franchisee from being able to comprehend the actual impact to the franchisee's

bottom line. Quiznos promotes these mandated services as being critical to "the brand" when in fact they have no direct connection to the brand whatsoever, and no direct relation to quality standards. In fact, the true purpose of these mandated services is to provide kickbacks to Quiznos.

59. Defendants' practices of knowingly overcharging franchisees and requiring kickbacks from approved vendors are directly contrary to Quiznos' representations to franchisees made in its various UFOCs, which provide, for example, in 2003 and 2004, that "[w]e and our affiliates negotiate purchase agreements with suppliers for the benefit of Franchisees." These practices as described herein are also directly contrary to statements routinely made by Quiznos' Area Directors (who supervise the franchisees regionally) and others involved in the process of inducing the public to purchase Quiznos franchises, to the effect that Quiznos uses its "buying power" created by the size of its franchise system to negotiate volume discounts from suppliers and pass those discounts on to franchisees. Recently-appointed Chief Executive Officer Gregory D. Brenneman concedes in a February 24, 2007 article in the New York Times that franchisee profitability is a problem at Quiznos, claiming "it was clear [when he got involved with the company] that food costs, as a percent of revenue were, quite honestly out of line . . ."

60. Quiznos and its affiliated entities receive substantial revenues from Quiznos' systematic and fraudulent overcharging on direct sales to franchisees and kickbacks on sales made by approved vendors to franchisees. For example, upon information and belief, the Cervantes-owned American Food Distributors LLC had $93,324,012 in 2005 revenues, in addition to $33,353,377 in kickbacks from approved food vendors. Upon information and belief, Cervantes-owned Source One Distribution LLC, which sells equipment directly and/or through suppliers and distributors to Quiznos franchisees for their stores, received kickbacks from approved equipment vendors of $4,809,233 in addition to revenues of $60,365,204 in 2005.

## CLASS ACTION ALLEGATIONS

61.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons defined as:

> All Illinois residents (including persons and business entities) that owned a Quiznos franchise during the longest period permitted by the applicable statutes of limitations. Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

**Rule 23(a)**

62.     **Numerosity**: Members of the Class are so numerous that their individual joinder is impractical.  The precise identities, number and addresses of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants, third parties, and their respective records.

63.     **Existence of Common Questions of Fact and Law**:   There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class. The common questions of fact and law include, among other things:

(a)     Whether and to what extent Defendants' practices, conduct, and misrepresentations violate federal or state law;

(b)     Whether Defendants have engaged in mail and wire fraud;

(c)     Whether Defendants engaged in a pattern of racketeering activity;

(d)     Whether the Quiznos franchise system is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(e)     Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(f)     Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(a) and (c) proximately caused injury to the Plaintiffs' and class members' business or property;

(g)     Whether the market for participation in the Quiznos franchise system constitutes a product market in which Defendants maintain substantial market power;

(h)     Whether Defendants unlawfully coerced franchisees to purchase specific goods and services from them as a condition for the right to participate in the Quiznos franchise system;

(i)     Whether such anti-competitive tying violates state and/or federal law;

(j)     Whether Defendants' unlawful anticompetitive practices violate 15 U.S.C. § 1;

(k)     Whether Defendants' unlawful anticompetitive practices violate the Illinois Antitrust Act, 740 ILCS § 10/1 *et seq.*;

(l)     Whether, in connection with filing, offer, or sale of the subject franchises, Defendants directly or indirectly employed any devices, schemes, or artifices to defraud Plaintiffs within the meaning of the Illinois Franchise Disclosure Act, 815 ILCS § 705 *et seq.* ("IFDA") or the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505 *et seq.* ("ICFA");

(m)     Whether, in connection with filing, offer, or sale of the subject franchises, Defendants directly or indirectly made any untrue statements of material fact or omitted certain material facts necessary in order to make the statement(s) made, in the light of the circumstances under which they are made, not misleading under the IFDA or the ICFA;

(n)     Whether, in connection with filing, offer, or sale of the subject franchises, Defendants directly or indirectly engaged in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any person, within the meaning of the IFDA or the ICFA;

(o)     Whether Defendants' affirmative statements and material omissions constitute intentional fraud;

(p)     Whether Quiznos' UFOC contained fraudulent misrepresentations and omissions;

(q)     Whether Quiznos breached the terms of the agreement contained in the UFOCs;

(r)     Whether Plaintiffs sustained injury as a result of Quiznos' breaches of the Franchise Agreement and/or the implied covenant of good faith and fair dealing;

(s)     Whether any of the provisions of the subject Quiznos franchise agreements were void and/or unenforceable under the terms of the IFDA or the ICFA;

(t)     Whether Plaintiffs and Class members are entitled to recover compensatory, exemplary, treble, statutory or punitive damages based on Defendants' fraudulent, illegal, anticompetitive conduct or practices and/or otherwise; and

(u)     Whether Plaintiffs' and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

64.     **Typicality**:  Plaintiffs are members of the Class.  Plaintiffs' claims have a common origin and share common bases.  Their claims originate from the same illegal, fraudulent and confiscatory practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the Class members.  If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

65. **Adequacy**: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained competent counsel, and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

**Rule 23(b)(2) and (3)**

66. This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Plaintiffs and the Class seek declaratory and injunctive relief, and all of the above factors of numerosity, common questions of fact and law, typicality and adequacy are present. Moreover, Defendants have acted on grounds generally applicable to Plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

67. This lawsuit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices. Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes. Even if individual class members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against Defendants.

**Statute of Limitations Estoppel**

68.     Throughout the implementation of their fraud and continuing until the present day, Defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiffs and the Class from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

69.     In particular, various Quiznos representatives have consistently and routinely represented that the franchisees' concerns raised in this Complaint and elsewhere were of the utmost importance to Quiznos and would be rectified, which have served the deliberate purpose of lulling Plaintiffs into believing that Quiznos had their best interest at heart and that the pursuit of legal action was unnecessary.  The following serve as examples:

(a)     When Quiznos reached the milestone of having opened 1800 franchises in or about 2003, it falsely represented to its franchisees that it constituted a "buying club" and that prices for food and supplies would be going down;

(b)     In Spring 2005, Brian Savage, a Quiznos representative based in Illinois, represented to Plaintiff Siemer, when Siemer inquired about the reasons for lower than expected financial returns, that she should sit tight and that the matter was entirely seasonal and that "sales would pick up in the summer";

(c)     In 2005, Plaintiff Siemer learned that she was on Quiznos "Endangered Species" list and was told by Quiznos Vice President Andy Abbajay and Mr. Savage that help was on its way and Quiznos cared about her long-term economic viability;

(d)     In an Annual Meeting in 2005 in Dallas, Texas, Quiznos falsely stated that food and supply pricing would be lowered and that Pepsi would be providing revenue for advertising;

(e)     In regular meetings of the regionally-based Marketing Action Teams ("MATs"), Quiznos falsely impresses upon MAT members (including Plaintiff Grachan) that Quiznos, including Chief Executive Officer Brenneman, is concerned about changes to help franchisees become profitable and deliberately requests members of the MAT team to contact store owners and advise of Quiznos intent to resolve the problems with the franchise system;

(f)     In a videotaped presentation from 2005, Steve Shaffer, Quiznos' former President, stated: "In 2005 franchise profitability is one of my top priorities. There are two ways for franchisees to make more money: 1. increase sales and 2. lower costs. We've made some strides by increasing sales and we've shown some improvement in lowering costs but discounts remain way too high. Rest assured, we will lower discount rates."

(g)     In a videotaped presentation from 2006, President Shaffer claimed: "Our top priority for 2006 is to help you reduce your FLPDs. In 2005, our chain's FLPDs were around 59% and that is just too high."

70.     The purpose of these ongoing communications was to dissuade franchisees from taking any action, legal or otherwise, to enforce their rights.

71.     Defendants have also actively concealed information necessary for Plaintiffs and the Class to discover the existences of their causes of action. Plaintiffs and the Class relied on the Defendants' actions and/or omissions in failing to discover the factual and legal basis of their claims.

72.     As a result of Defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, Plaintiffs and the Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims. Accordingly, Defendants are estopped from raising affirmative defenses relying upon any statutes of limitations or contractual limitations periods otherwise applicable to the claims asserted herein by Plaintiffs.

## FIRST CLAIM FOR RELIEF
## CIVIL RICO (18 U.S.C. § 1962(C))
## (FRAUDULENT SCHEME
## TO SELL ESSENTIAL GOODS AT INFLATED PRICES)
## ON BEHALF OF ALL PLAINTIFFS

73.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

74.     Defendants QFII, QFA, TQSC, Cervantes, Rick Schaden and Dick Schaden have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

75.     The Quiznos franchise system, which is comprised of Defendants QFII, QFA, TQSC, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise is separate and distinct from the individual defendants that participate in it and direct its affairs; the structure of the enterprise is imposed by, among other things, the terms of the various franchise agreements upon which defendants have relied in requiring plaintiffs to take certain actions and to refrain from taking other actions. There are numerous aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of submarine sandwiches and other products by plaintiffs to members of the general public, the advertising of plaintiffs' stores and of Quiznos generally by both plaintiffs and by the Quiznos defendants themselves, the hiring of employees by franchisees, and many other day-to-day business activities that do not partake of criminality.

76.     The defendants conduct the affairs of the enterprise, as opposed to merely their own affairs, by, among other things, invoking provisions of the franchise agreement to require

26

the plaintiffs to take certain actions and to refrain from taking certain actions, and in general by asserting control over the activities of franchisees in a hierarchical manner.

77.     Defendant QFII participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources. Defendants further gained control over franchisees by sanctioning unreasonable loan and financing arrangements for inflated prices for store establishment that could not be reasonably repaid by the average Quiznos store's cash flow, placing Plaintiffs in submissive positions for fear of losing their only cash flow and facing imminent bankruptcy. Defendants also engage or engage third-parties in the resale of Quiznos franchisees across the country at sales prices significantly below the original investment of the original franchisee, thereby devaluing the overall market value of a Quiznos franchise and making it difficult for any franchisee to recoup its investment.

78.     If it were not for the separate legal existence of the franchisees, the defendants would not have been able to effectuate their scheme of conducting the affairs of the enterprise so as to defraud the plaintiffs of money and/or property. For example, only by virtue of the separate existence of individuals and companies who agree to purchase Quiznos franchisees can the defendants fraudulently induce such purchases. This would be impossible if Quiznos operated exclusively through company-owned stores, and this, among other reasons, is why Quiznos divested itself of all corporate stores except two, having once owned 35 in their early growth years.

79.     Defendant QFA participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

80.     To the extent that rights to enforce and apply the franchise agreements of the Plaintiffs have in fact been delegated to defendant TQSC, defendant TQSC has participated in the conduct of the enterprise through the exercise of its control, granted to it by the franchise agreements, over the Plaintiffs' purchase of products, services and materials by requiring the Plaintiffs to purchase such products, services and materials at prices that were known to QFII to be higher than their fair market value and greater than the prices for which franchisees could have purchased identical or higher-quality products, services and materials in arm's length transactions from truly independent sources.

81.     Defendant Cervantes has participated in the conduct of the enterprise by its provision of products and services to the Plaintiffs through its affiliates.

82.     Defendants Rick Schaden and Dick Schaden have participated in the affairs of the enterprise by virtue of their positions as officers and/or directors of Defendants QFII, QFA and TQSC, in which positions, upon information and belief, they either made or approved decisions to knowingly overcharge Plaintiffs for products, services and materials which Plaintiffs were required to buy in order to operate their franchises, and to require Plaintiffs to purchase products, services and materials from approved vendors whose prices to franchisees were known by Dick Schaden and Rick Schaden to be inflated beyond fair market value because of kickbacks that the

approved vendors were required to pay one or more Quiznos entities in order to become approved vendors.

83.     The predicate crimes committed by Defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by 18 U.S.C. § 1343.

84.     In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, Defendant QFII devised and effected a scheme to defraud the Plaintiffs that have franchise agreements signed in and after February 2005, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

85.     The execution of the scheme to defraud by Defendant QFII involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Defendant QFII.

86.     Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of Defendant's fraudulent scheme are as follows:  payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendant's fraudulent overcharging practices.

87.    In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, Defendant QFA devised and effected a scheme to defraud the Plaintiffs that have franchise agreements signed prior to February 2005, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

88.    The execution of the scheme to defraud by Defendant QFA involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by Defendant QFA.

89.    Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of Defendant's fraudulent scheme are as follows:  payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendant's fraudulent overcharging practices.

90.    To the extent that the franchisor's rights under Plaintiffs' franchise agreements have been delegated to Defendant TQSC, Defendant TQSC devised and effected a scheme to defraud the Plaintiffs in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, which scheme consisted of deliberately and knowingly overcharging the Plaintiffs (on purchases made directly

from a Quiznos-controlled entity) or deliberately and knowingly causing the Plaintiffs to be overcharged (on purchases made from an approved vendor required to pay kickbacks to Quiznos as a condition of becoming approved) for products, services and materials they are required to purchase in order to operate their franchises.

91. The execution of the scheme to defraud by Defendant TQSC involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendant TQSC. The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because the practice of fraudulently overcharging the Quiznos franchisees for products, services and materials they must purchase in order to operate their stores is a crucial means by which Quiznos maintains its high revenues and profits. Indeed, the scheme is likely to continue on its present course until Quiznos existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

92. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendant's fraudulent scheme are as follows: payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendant's fraudulent overcharging practices.

93.     The predicate acts committed by defendants as alleged herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

94.     The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the same victims of money each time a fraudulently inflated price is charged to the franchisee and received, in the form of a direct payment to Quiznos or a kickback paid to Quiznos by an approved supplier, by Quiznos or an affiliated entity. In addition, all of the Quiznos franchisees across the United States, current and past, have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

95.     Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF
## CIVIL RICO (18 U.S.C. § 1962(C))
## (FRAUDULENT SCHEME TO SELL FRANCHISE AGREEMENTS)
## ON BEHALF OF ALL PLAINTIFFS

96.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

97.     Defendants QFII, QFA, TQSC, Cervantes, Rick Schaden, Dick Schaden, Mortier, Goldfarb, Goldberg, Curatola, Voso, and Eller have violated 18 U.S.C. § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

98.     The Quiznos franchise system, which is comprised of Defendants QFII, QFA, TQSC, TQM, Cervantes and its affiliates and/or subsidiaries that sell products, services and

materials to franchisees, and all of Quiznos franchisees nationwide, is an "association-in-fact"
enterprise within the meaning of 18 U.S.C. § 1961(4). This enterprise is separate and distinct
from the individual defendants that participate in it and direct its affairs; the structure of the
enterprise is imposed by, among other things, the terms of the various franchise agreements upon
which defendants have relied in requiring plaintiffs to take certain actions and to refrain from
taking other actions. There are numerous aspects of the operation of this enterprise that do not
involve conduct that is intrinsically criminal or illegal, including but not limited to the sale of
submarine sandwiches and other products by plaintiffs to members of the general public, the
advertising of plaintiffs' stores and of Quiznos generally by both plaintiffs and by the Quiznos
defendants themselves, the hiring of employees by franchisees, and many other day-to-day
business activities that do not partake of criminality.

99. The defendants conduct the affairs of the enterprise, as opposed to merely their
own affairs, by, among other things, invoking provisions of the franchise agreement to require
the plaintiffs to take certain actions and to refrain from taking certain actions, and in general by
asserting control over the activities of franchisees in a hierarchical manner.

100. Defendant QFII participated in the conduct of the enterprise through inducing the
purchase of franchises by Plaintiffs, among thousands of others, by knowingly misrepresenting
facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise,
about the revenues and profit margins that franchises could expect to receive, as alleged
specifically herein.

101. If it were not for the separate legal existence of the franchisees, the defendants
would not have been able to effectuate their scheme of conducting the affairs of the enterprise so
as to defraud the plaintiffs of money and/or property. For example, only by virtue of the separate
existence of individuals and companies who agree to purchase Quiznos franchisees can the

defendants fraudulently induce such purchases. This would be impossible if Quiznos operated exclusively through company-owned stores.

102. Defendant QFA participated in the conduct of the enterprise through inducing the purchase of franchises by Plaintiffs, among thousands of others, by knowingly misrepresenting facts about Quiznos' policies and procedures, about the costs of running a Quiznos' franchise, about the revenues and profit margins that franchises could expect to receive, as alleged specifically herein.

103. Defendant Cervantes has participated in the conduct of the enterprise by its provision of products and services to the Plaintiffs through its affiliates.

104. Defendants Rick Schaden and Dick Schaden have participated in the affairs of the enterprise by virtue of their positions as officers and/or directors of Defendants QFII, QFA and TQSC, in which positions, upon information and belief, they either made or approved decisions to knowingly induce franchise sales through misrepresentation and deceit.

105. Defendants Mortier, Goldfarb, Goldberg, Curatola, Voso and Eller and other Quiznos employees and representatives like them have participated for their own financial benefit in the affairs of the enterprise by knowingly making misrepresentations of fact to Plaintiffs and other prospective franchisees for the purpose of inducing them to purchase Quiznos franchises.

106. The predicate crimes committed by defendants are mail fraud as defined by 18 U.S.C. § 1341 and wire fraud as defined by U.S.C. § 1343.

107. In violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, defendants devised and effected a scheme to defraud prospective franchisees by knowingly and deliberately making false representations of fact, and/or omitting material true facts, to prospective franchises in order to induce them to purchase a Quiznos franchise.

108. The execution of the scheme to defraud by defendants involved numerous individual instances of the use of the United States mails and interstate wire facilities in furtherance of the scheme, which uses of the United States mails and interstate wire communications were reasonably foreseeable by defendants.

109. Specific instances of the uses of the United States mails and interstate wire facilities in furtherance of defendants fraudulent scheme are as follows: Uniform Franchise Offering Circulars and franchise agreements were distributed using the United States mails; Mortier, Goldfarb, Goldberg, Curatola, Voso and Eller made and received telephone calls to and from prospective franchisees in which further fraudulent representations and omissions were made in order to induce entry into franchise agreements; payments made by Plaintiffs for products, services and materials at the aforesaid fraudulent prices were automatically withdrawn from Plaintiffs' bank accounts through electronic funds transfers made using interstate wire; Plaintiffs received shipments or deliveries of some products for which they were required to pay fraudulently inflated prices through the United States mails; and Plaintiffs received facsimile transmissions and electronic mail messages sent over interstate wire facilities which dealt with pricing for the products, services and materials affected by Defendants' fraudulent overcharging practices.

110. Prior to the Siemer Plaintiffs signing their Franchise Agreement and investing significant sums in store operations, Defendants QF, Mortier, Goldfarb, Goldberg, Curatola and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchises in the State of Illinois, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Siemer Plaintiffs to sign their Franchise Agreement. In addition, after the Siemer Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the

35

pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(a) Prior to signing the Franchise Agreement, at a meeting with Plaintiff Siemer in or about August 2003 at Defendant Mortier's office in Bloomingdale, Illinois, Defendants QF and Mortier intentionally misrepresented Quiznos' encroachment policy, fraudulently stating that Quiznos "doesn't encroach like Subway" and that Plaintiff Siemer "could pick from any location on the map";

(b) At that same meeting, Defendants QF, Mortier, and a female Quiznos representative whose name is unknown to Plaintiff Siemer, intentionally misrepresented that the Quiznos' real estate process was "very easy" and that she "shouldn't encounter any problems" with Quiznos assisting her;

(c) At that same meeting, Defendant Mortier told Plaintiff Siemer that "average store sales are $421,000" and that he didn't see any reason why someone in the locale where the Siemer Plaintiffs intended to operate a store would do less than that;

(d) Prior to the Siemer Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants QF, Mortier, Goldfarb, Goldberg, and various other Quiznos representatives and employees who sold the Siemer Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "Net 2" data, which had no relation to the actual expenses that the Siemer Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "Net 2" financial data gave a false impression of a typical franchisee's experience;

(e)     Prior to the Siemer Plaintiffs signing the Franchise Agreement, Defendants QF, Mortier, Goldfarb, Goldberg, and various other Quiznos representatives and employees who sold the Siemer Plaintiffs their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

(f)     Prior to the Siemer Plaintiffs signing their Franchise Agreement, and during a Quiznos sales seminar, Plaintiff Siemer viewed a video presented by Defendants QF, Mortier, and various other Quiznos representatives and employees, which falsely claimed that franchisees would be "provided with assistance from Quiznos throughout the process";

(g)     Prior to the Siemer Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants QF, Mortier, Goldfarb, and Goldberg failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(h)     Prior to the Siemer Plaintiffs opening their store (but subsequent to signing the Franchise Agreement), Defendants QF and Mortier represented that "the average Quiznos store was doing over $421,000 per year" and that Plaintiff Siemer should have "no problem" making that much once she brought the store back up to Quiznos standards;

(i)     Prior to the Siemer Plaintiffs opening their store, Defendants QF and Mortier falsely represented that the sole reason the store's previous owner had failed was because the prior owner "did not follow Quiznos rules" and that so long as Plaintiff Siemer did follow those rules she would be able to operate her franchise successfully;

(j)     Prior to the Siemer Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants QF, Mortier, Goldfarb, and Goldberg failed to

37

disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise;

(k)     Prior to the Siemer Plaintiffs signing their Franchise Agreement and before they opened their store, Defendants QF, Mortier, Goldfarb, and Goldberg failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers; and

(l)     Prior to the Siemer Plaintiffs signing their Franchise Agreement and commercial lease for the store they acquired, Defendant Curatola represented that the store was fully updated when, subsequent to their signing these agreements, he required the Siemer Plaintiffs to spend $18,000 in construction upgrades with a contractor that Defendant Curatola insisted they use.

111.    These representations and omissions made to the Siemer Plaintiffs are extrinsic to their Franchise Agreement. The Siemer Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

112.    Prior to the Grachan Plaintiffs signing their Franchise Agreement and investing significant sums in store operations, Defendants QF and various Quiznos employees and representatives, including QF's representatives assigned to sell franchises in the State of Illinois, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Grachan Plaintiffs to sign their Franchise Agreement. In addition, after Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(a)     Prior to the Grachan Plaintiffs signing their Franchise Agreement, during a Quiznos sales seminar at a hotel in Schaumberg, Illinois in March or April of 2004, Defendants QF and a Quiznos representative of Indian descent whose name Plaintiff Grachan cannot recall, represented that "they could expect a 15% to 25% profit from their store";

(b)     Prior to the Grachan Plaintiffs signing their Franchise Agreement, but subsequent to the seminar in Schaumberg, Plaintiff Grachan viewed a CD and other marketing materials that QF provided, which falsely claimed that "the average Quiznos store was doing over $400,000 per year";

(c)     Prior to the Grachan Plaintiffs signing the Franchise Agreement, and during the Quiznos sales seminar at the hotel in Schaumberg, they viewed a video presented by Defendants QF and various Quiznos employees and representatives, which falsely claimed that franchisees would be "provided with assistance from Quiznos throughout the process";

(d)     Prior to the Grachan Plaintiffs signing the Franchise Agreement, during a one-on-one meeting with a gentleman named "Tom," the Quiznos representative who sold the Grachan Plaintiffs their franchise, Quiznos falsely represented that the average store was doing $400,000 a year and represented that the 15-25% profit claim of the QF representative at the sales seminar "sounded about right";

(e)     Prior to the Grachan Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants QF and "Tom," the Quiznos representative who sold the Grachan Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "Net 2" data, which had no relation to the actual expenses that the Grachan Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "Net 2" financial data gave a false impression of a typical franchisee's experience;

(f)     Prior to signing the Franchise Agreement, Defendants QF and "Tom," the Quiznos representative who sold the Grachan Plaintiffs their franchise, failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

(g)     Subsequent to the Grachan Plaintiffs signing their Franchise Agreement but before making significant investments in their store in December 2004, Defendant Goldberg falsely represented in a meeting that the Quiznos location which the Grachan Plaintiffs purchased should gross $500,000 per year; and

(h)     Defendants QF and various Quiznos employees and representatives, including "Tom," the Quiznos representative who sold the Grachan Plaintiffs their franchise, and a QF representative named Brian Dershow, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers.

113.    These representations and omissions made to the Grachan Plaintiffs are extrinsic to their Franchise Agreement. The Grachan Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

114.    Prior to the Kusztelak Plaintiffs signing their Franchise Agreement and investing significant sums in store operations, Defendants QF, Eller, and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchises in the State of Illinois, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Kusztelak Plaintiffs to sign their Franchise Agreement. In addition, after the Kusztelak Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations

and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(a)    Prior to pursuing store operations at Quiznos Store No. 1939, at a training seminar in Denver, Defendants QF and Eller represented that "the average Quiznos store was doing over $400,000 per year" and that Plaintiff Kusztelak should have "no problem" making that much once he brought the store back up to Quiznos' standards, a fraudulent inducement to make Plaintiffs Kusztelak believe that the sole basis for the previous owner's failure was the franchisee's failure to follow Quiznos' standards;

(b)    Prior to pursuing store operations at Quiznos Store No. 1939, which was failing under its previous owner, Defendants QF and Eller falsely represented that the sole reason the store had not been successful under previous management was because the prior owners "did not follow Quiznos rules," but that Plaintiff Kusztelak would be able to operate the store successfully if he complied with Quiznos mandates, which was another false statement meant to assure Plaintiff Kusztelak that the previous failure had nothing to do with the Quiznos system and was franchisee-specific;

(c)    Prior to the Kusztelak Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants QF, Eller, and various other Quiznos representatives and employees who sold the Kusztelak Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "Net 2" data, which had no relation to the actual expenses that the Kusztelak Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "Net 2" financial data gave a false impression of a typical franchisee's experience;

(d)    Prior to Kusztelak Plaintiffs signing the Franchise Agreement, Defendants QF and Eller failed to disclose that the food costs and other percentages specified in Quiznos

marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee;

(e)     Prior to the Kusztelak Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendants QF, Eller, and various other Quiznos employees and representatives, including Brian Dershow, failed to disclose that franchise owners are not reimbursed for retail customer coupons, greatly increasing the costs to franchisees of operating a Quiznos franchise; and

(f)     Prior to the Kusztelak Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendants QF, Eller, and various other Quiznos employees and representatives, including Brian Dershow, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers.

115.    These representations and omissions made to the Kusztelak Plaintiffs are extrinsic to their Franchise Agreement. The Kusztelak Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

116.    Prior to the Brar Plaintiffs signing their Franchise Agreement and investing significant sums in store operations, Defendants TQFC, Mortier, and various other Quiznos employees and representatives, including TQFC's representatives assigned to sell franchises in the State of Illinois, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Brar Plaintiffs to sign their Franchise Agreement. In addition, after the Brar Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

42

(a)     Prior to the Brar Plaintiffs signing the Franchise Agreement, Defendants TQFC and Mortier represented to the Brar Plaintiffs that their Quiznos store would do "between $60,000 and $70,000 a month" and that they would "realize a profit of 30% of their gross";

(b)     Prior to the Brar Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendants TQFC and Mortier failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c)     Prior to the Brar Plaintiffs signing the Franchise Agreement, Defendants TQFC and Mortier failed to disclose actual failure rates for a Quiznos franchise and deliberately misrepresented the data on franchise turnovers contained in the UFOC which understated the failure rates;

(d)     Prior to the Brar Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants TQFC, Mortier, and various other Quiznos representatives and employees who sold the Brar Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "Net 2" data, which had no relation to the actual expenses that the Brar Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "Net 2" financial data gave a false impression of a typical franchisee's experience;

(e)     Prior to the Brar Plaintiffs signing the Franchise Agreement, Defendants TQFC and Mortier failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee; and

(f)     Prior to the Brar Plaintiffs signing the Franchise Agreement and their lease, Defendants TQFC and Mortier misrepresented to the Brar Plaintiffs that their monthly rent

of $7,500 was a fair market rate when, in fact, it was one of the higher rents for the suburban market — a misrepresentation based, upon information and belief, on the fact Defendant Mortier was to get a "kickback" from Quiznos.

117.    These representations and omissions made to the Brar Plaintiffs are extrinsic to their Franchise Agreement.    The Brar Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

118.    Prior to the Cohen Plaintiffs signing their Franchise Agreement and investing significant sums in store operations, Defendants QF and various other Quiznos employees and representatives, including QF's representatives assigned to sell franchises in the State of Illinois, made certain fraudulent statements and omissions. In perpetrating these frauds, Defendants sought to induce the Cohen Plaintiffs to sign their Franchise Agreement. In addition, after the Cohen Plaintiffs signed their Franchise Agreement, Defendants continued to make fraudulent statements and omissions intended to induce the pursuit of store operations and the investment of huge sums to allow the franchise to operate. These fraudulent statements and omissions were made at various times and locations as follows:

(a)    During a meeting between Plaintiff Cohen, his partner at the time, Larry Heller, and Quiznos Area Director Dominic Voso, during the last week in May 2002, at a Quiznos restaurant in Wheeling, Illinois, Voso falsely represented that Quiznos would not encroach on Cohen's prospective location in Gurnee, Illinois, by opening another restaurant in the same town, stating that, "I'm Larry's buddy" (referring to Cohen's partner) and "we would never do that";

(b)    Prior to the Cohen Plaintiffs signing the Franchise Agreement, Defendants QF and Voso failed to disclose that Quiznos continually changes its store policies without providing proper notice to its franchisees;

(c)     Prior to the Cohen Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendants QF and Voso failed to disclose that Quiznos does not reimburse franchise owners for coupons, promotional offers, and other discounts, thus concealing the true cost of operating a franchise;

(d)     Prior to the Cohen Plaintiffs signing the Franchise Agreement and before commencing store operations, Defendants QF and Voso failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services, and other materials that must be purchased from Quiznos or its approved suppliers;

(e)     Prior to the Cohen Plaintiffs signing the Franchise Agreement, during meetings and in written marketing communications, Defendants QF, Voso, and various other Quiznos representatives and employees who sold the Cohen Plaintiffs their franchise, affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "Net 2" data, which had no relation to the actual expenses that the Cohen Plaintiffs ultimately encountered in operating the franchise, even though Defendants knew that the "Net 2" financial data gave a false impression of a typical franchisee's experience; and

(f)     Prior to the Cohen Plaintiffs signing the Franchise Agreement, Defendants QF and Voso failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee.

119.    These representations and omissions made to the Cohen Plaintiffs are extrinsic to their Franchise Agreement. The Cohen Plaintiffs discovered these misrepresentations and omissions within the applicable statute of limitations.

120.    The predicate acts committed by Defendants as alleged herein constitute a "pattern of racketeering activity: within the meaning of 18 U.S.C. § 1961(5).

121.    The acts of mail fraud and wire fraud as alleged herein are related because they involve repeated instances of using the United States mails and interstate wire facilities to defraud the franchisees through their payment of the initial franchise fee, as well as other future payments to be received by Quiznos, such as for overpriced products, services, materials and the like.   In addition, all of the Quiznos franchisees across the United States have also been victimized by this fraudulent scheme, meaning that the scheme has literally thousands of victims.

122.    The acts of mail fraud and wire fraud as alleged herein threaten to continue indefinitely into the future because Quiznos' business model is built upon continually increasing the number of new franchises coming into the system.  Indeed, the scheme is likely to continue on its present course until Quiznos' existing majority shareholders achieve their ultimate goal of selling the entire company to an outside buyer.

123.    Plaintiffs have been damaged by reason of the defendants' conducting the affairs of the Quiznos franchise system through the pattern of racketeering activity as alleged herein.

**THIRD CLAIM FOR RELIEF**
**ILLEGAL TYING UNDER § 1 OF THE SHERMAN ACT**
**ON BEHALF OF ALL PLAINTIFFS**

124.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

125.    There exists a market for ownership interests in Quick Service Toasted Sandwich Restaurant Franchises, in which Quiznos maintains substantial market power.   Quiznos maintains over 4,000 shops in the United States.  It is one of the dominant players in the sandwich and bakery franchise category, and is the top ranked sandwich chain by sales growth in the United States.

126.    A separate market exists for the related goods and services associated with the operation of a Quick Service Toasted Sandwich Restaurant Franchises, including raw materials, services and food products (referred to throughout this Complaint as "Essential Goods").

127.    Quiznos affiliates, including entities in which it maintains a financial or other ownership interest, as well as approved vendors from which it receives contractual kickbacks, are the sole sources from which Plaintiffs and the Class may purchase Essential Goods. As a practical matter, Quiznos will not approve suppliers who do not agree to pay kickbacks to Quiznos or affiliated entities as a condition of obtaining such approval.

128.    Quiznos conceals the nature of its relationships with its affiliates and approved vendors from potential franchisees including Plaintiffs and the Class members, in order to lock them into onerous franchise agreements and create excessive switching costs.

129.    At all times Quiznos and its affiliates had monopoly power, market power and/or economic power in the relevant Quick Service Toasted Sandwich Restaurant Franchises market, sufficient to force Plaintiffs and the Class to purchase and accept Essential Goods from Quiznos-affiliated vendors.

130.    By reason of the terms of the franchise agreements and the investments the franchisees have made in their franchises, Quiznos has substantial power in the market for both Quick Service Toasted Sandwich Restaurant Franchises and the market for Essential Goods.

131.    Quiznos manipulates its economic power in the Quick Service Toasted Sandwich Restaurant Franchises market to coerce Plaintiffs and the Class to purchase essential goods solely from its affiliates, through contractual provisions contained in franchise agreements, as well as exploitation of pre-contractual information deficiencies and post-contractual switching costs.    Through these and other means, Quiznos can and does coerce franchisees to purchase

nearly all of the products, services and materials they need from Quiznos itself or from approved vendors designated and controlled by Quiznos and its affiliates.

132.     Through the exercise of Quiznos' economic power as alleged herein, Quiznos has conditioned the purchase by Plaintiffs of their franchises and their continued existence as franchisees upon their purchase of Essential Goods from Quiznos itself or from approved vendors in which it maintains a financial interest.

133.     As a direct and proximate result of Defendants' anticompetitive tying activity, Plaintiffs and the Class have been injured by being forced to pay supra-competitive prices for Essential Goods.

134.     A substantial amount of interstate commerce in Essential Goods needed to operate a Quiznos franchise has been adversely affected and Quiznos' practices impose an unreasonable negative effect on competition in the marketplace, because Quiznos' policy of coercing and conditioning the purchase and operation of a franchise and the purchase by franchisees of Essential Goods forecloses the ability of vendors unwilling to pay kickbacks to Quiznos and its affiliated entities from selling their products, services and materials to the Plaintiffs, even though the quality of such products, services and materials is equal to if not better than the quality of what is supplied by Quiznos-approved vendors.

135.     Quiznos' tie of its franchises to products, services and materials from approved suppliers imposes an unreasonable restraint upon commerce and is therefore *per se* unlawful and in violation of Section One of the Sherman Act, 15 U.S.C § 1, and has caused damage to the Plaintiffs and the Class.

136.     Alternatively, if Quizno's tying conduct is not *per se* unlawful, it is unlawful under the rule of reason, in that the anticompetitive consequences of defendants' conduct outweigh any pro-competitive effects thereof. Not only does Quiznos' conduct impose supra-

competitive prices on Plaintiffs and the Class, it impedes the ability of other suppliers to engage in competition with Quiznos' affiliates and vendors to provide higher quality raw materials, services and food products at lower costs. Moreover, consumers are injured in that they are forced to indirectly pay the kickbacks and excessive prices for product charged to franchises by Quiznos' affiliates and vendors. There is no pro-business or efficiency justification for the kickbacks and supra-competitive pricing, nor does any legitimate business purpose require these practices.

137.    By reason of the illegal conduct of Quiznos as alleged herein, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial and then trebled pursuant to 15 U.S.C. § 15, and to permanent injunctive relief prohibiting Quiznos' unlawful tying conduct.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT**
**ON BEHALF OF ALL PLAINTIFFS**

138.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

139.    The aforementioned practices of Defendants were and are in violation of the Illinois Antitrust Act, 740 ILCS § 10/1 *et seq.*

140.    Specifically, Defendants have contracted, combined, or conspired with one or more other persons to unreasonably restrain trade or commerce, or have attempted to establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

141.    Additionally, Defendants have leased or made a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services, whether patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price charged thereof, or

discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodity or service of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for such sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

142. As a result of the conduct described above, Plaintiffs and the Class have sustained and will continue to sustain substantial losses and damage to their businesses and property in the form of, among other things, the supra-competitive prices for Essential Goods that they were forced to pay as part of Defendants' unlawful and anticompetitive conduct. The full amount of such damages are presently unknown and will be determined after discovery and upon proof at trial

143. Plaintiffs and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, and all other available relief for their injuries caused by these violations pursuant to this statute.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT OF 1987**
**705 ILCS § 6**
**ON BEHALF OF ALL PLAINTIFFS**

144. Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

145. Plaintiffs are "Franchisees" and Quiznos is a "Franchisor" within the meaning of Section 3 of the Illinois Franchise Disclosure Act ("IFDA"), 705 ILCS § 705 *et seq.*

146. Quiznos, through its agents and representatives, and in connection with the offer and/or sale of its franchises as set out in this Complaint, employed a scheme or pattern of

conduct, through which it has directly or indirectly defrauded the class plaintiffs, in violation of 705 ILCS § 6.

147.    Additionally, Quiznos, through its agents and representatives, and in connection with the filing, offer, and/or sale of its franchises as set out in this Complaint, has engaged in acts, practices and courses of business which operate as a fraud and/or deceit upon the class plaintiffs in violation of 705 ILCS § 6.

148.    Furthermore, in perpetuating this fraud and deceit, Quiznos, through its agents and representatives, has made untrue statements of material fact or omissions of material facts, including, but not limited to the following:

(a)    Quiznos, through its agents and representatives, deliberately understated the costs and expenses of opening and operating a Quiznos franchise;

(b)    Quiznos, through its agents and representatives, failed to disclose the substantial markups and kickbacks that add to the price of food, supplies, services and other materials that must be purchased from Quiznos or its approved suppliers;

(c)    Quiznos, through its agents and representatives, intentionally misrepresented its encroachment policy with respect to franchise locations, fraudulently stating that it maintains a general rule pursuant to which it does not open up stores within a 3–5 mile radius of each other;

(d)    Prior to obtaining Plaintiffs' signatures on the Franchise Agreements, in meetings and written marketing communications, Defendants affirmatively misrepresented the expense data associated with a Quiznos franchise through the use of "Net 2" data, which had no relation to the actual expenses that the Plaintiffs ultimately encountered in operating the franchise, even though they knew that actual expenses would best be demonstrated with what Quiznos calls "Net 3" data; and

(f)     Prior to signing the Franchise Agreement, Defendants failed to disclose that the food costs and other percentages specified in Quiznos marketing materials were calculated based on "Net 2" data, as opposed to "Net 3" data, which represented the revenues that would actually be received by a franchisee.

149.     By reason of Quiznos' violations of the IFDA as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT OF 1987**
**705 ILCS § 16**
**ON BEHALF OF ALL PLAINTIFFS**

150.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

151.     Section 16 of the IFDA sets forth the rules pertaining to the form and content of disclosure statements that a franchisor must strictly comply with prior to the sale a franchise in the State of Illinois.

152.     As set out in this Complaint, Quiznos violated 705 ILCS §16 by including false or misleading statements of material fact within its disclosure statement, including, without limitation, those related to: (a) the true costs of food and supplies; (b) the potential (or lack thereof) for making a profit; (c) Quiznos actual approach to encroachment; (d) the effect of being required to purchase food and supplies from Quiznos-mandated suppliers; (e) the actual turnover rates for the brand; (f) the actual impact of Quiznos' "kickbacks" on the ability of the franchisees to achieve a return on their investment; (g) the true meaning behind Quiznos' claim in their UFOC that it uses its buying power "for the benefit of franchisees"; and (h) the contemplated and actual use of advertising fees paid by the franchisees.

153.    Quiznos further violated Section 16 of the IFDA by omitting material facts required to be stated or necessary to make the misleading statements not misleading, including, without limitation, the items identified in the preceding paragraph.

154.    By reason of Quiznos' violations of the IFDA as alleged herein, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### INTENTIONAL FRAUD
### (FRAUD IN THE INDUCEMENT)
### ON BEHALF OF ALL PLAINTIFFS

155.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

156.    As alleged with specificity in this Complaint, Defendants knowingly made false statements of fact to, and omitted or concealed true statements of fact from the Plaintiffs.  With respect to each such true statement alleged to have been omitted or concealed by the Defendants, the Defendants owed each Plaintiff a duty to disclose the truth of such omitted or concealed fact.

157.    The statements and omissions of the Defendants as alleged herein were untrue.

158.    Defendants knew or should have known that their affirmative statements as alleged herein were false, and that their omissions or concealments were deceptive by virtue of being incomplete.

159.    The Defendants made the false statements, and engaged in the omissions and concealments, with the intent to defraud the Plaintiffs and in order to induce the Plaintiffs to rely on the statements, omissions and concealments.

160.    Each Plaintiff believed the false statements made to him or her, or believed that no facts existed inconsistent with Defendants' omissions and concealments, and acted in reliance upon those beliefs to his or her detriment.

161.    As a result of their detrimental reliance on Defendants' fraudulent statements and omissions, Plaintiffs and the Class have been damaged in the future in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
### ON BEHALF OF ALL PLAINTIFFS

162.    Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

163.    The UFOCs presented to Plaintiffs represented that Quiznos would "negotiate purchase agreements with suppliers for the benefit of Franchisees." Pursuant to the terms of each Plaintiff's franchise agreement, the representations of Quiznos in the UFOC are made part of each franchise agreement between the parties and by the express terms of each franchise agreement are considered "binding on franchisor in connection with the subject matter of the agreement."

164.    By using its control over the suppliers from whom Quiznos allows franchisees to purchase products, services and materials to increase its own revenues through its kickback scheme, and by failing to use its "market power" due to volume purchases for the benefit of franchisees, Quiznos has breached its promise to negotiate with suppliers for the benefit of franchisees.

165.    Quiznos has further breached its contractual obligations to Plaintiffs and the Class by, among other things: (a) failing to provide promised support and assistance in operating franchises; (b) failing to properly appropriate advertising funds; (c) failing to disclose the relationships it has with approved vendors, including the kickbacks it receives from them; (d) misusing the marketing funds paid by Plaintiffs and the Class for purposes prohibited by the

Franchise Agreement; and (e) failing to negotiate prices for food and supplies in a manner meant to benefit Plaintiffs.

166.     As a proximate result of Quiznos' breaches of contract as alleged herein, Plaintiffs and the Class have been damaged in amounts to be proven at trial.

### NINTH CLAIM FOR RELIEF
### BREACH OF THE COVENANT OF GOOD FAITH
### AND FAIR DEALING
### ON BEHALF OF ALL PLAINTIFFS

167.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

168.     Every agreement between the Plaintiffs and Quiznos includes not only express written provisions, but also those terms and conditions, which although not formally expressed, are implied by law.  Such implied terms are as binding as the terms that are actually written into the agreement.

169.     Inherent in all contracts is an implied covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the contract and will not take any action that will injure the other party or compromise his benefit of the contract.

170.     The obligations of Quiznos to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between Quiznos and Plaintiffs, which imbalance allows Quiznos to implement the business scheme described in detail in this Complaint and incorporated by reference.

171.     Quiznos breached the implied covenant of good faith and fair dealing by virtue of the deceptive practices described herein and by acts independent of the deceptive practices. Quiznos has denied Plaintiffs the ability to achieve their reasonable expectations in entering into the franchise relationship.

## TENTH CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS § 505/2
### ON BEHALF OF ALL PLAINTIFFS

172.   Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full.

173.   Plaintiffs are consumers as defined under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS § 505/1 *et seq.*

174.   The Quiznos franchise is merchandise as defined by 815 ILCS § 505/1.

175.   Quiznos' actions, including but not limited to the Quiznos business scheme as alleged and incorporated herein, failure to provide support as promised, as well as making promises and representations Quiznos knew or should have known it would not follow through on with the intent of inducing Plaintiffs to purchase a Quiznos franchise, constitute "the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the ICFA.

176.   Defendant's commission of unfair or deceptive acts and/or prohibited practices under the ICFA has caused each Plaintiff to suffer economic harm.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek the following relief:

   (a)   An Order certifying the proposed Class herein and appointing Plaintiffs and the undersigned counsel of record to represent the Class;

   (b)   An Order rescinding the Franchise Agreements of each and every Plaintiff and member of the Class based on Defendants' fraudulent inducement thereof or,

alternatively, damages for said fraud;

(c)    An Order issuing a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(d)    An Order issuing a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to take illegal action as set forth in this Complaint;

(e)    A Judgment awarding Plaintiffs and the Class compensatory, consequential, and statutory damages, including, without limitation, their loss of investment capital, loss of income, loss of assets and savings, pre-judgment interest and post-judgment interest;

(f)    A Judgment awarding Plaintiffs and the Class exemplary, punitive and treble damages;

(g)    A Judgment awarding Plaintiffs and the Class attorneys fees and costs; and

(h)    Such other relief as the Court finds just and proper.

Dated this 19 day of April, 2007.

KRAVIT HOVEL & KRAWCZYK S.C.
Attorneys for Plaintiffs


Mark M. Leitner
825 N. Jefferson St.
Milwaukee, WI 53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135

Of Counsel:
Justin M. Klein
Marks & Klein, LLP
63 Riverside Avenue
Red Bank NJ 07701
Telephone:  (732) 747-7100
Facsimile:  (732) 219-0625

Joseph S. Goode
Kravit, Hovel & Krawczyk S.C.
825 N. Jefferson St.
Milwaukee, WI  53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135

## **PLAINTIFFS DEMAND A JURY**