UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILENE SIEMER, FLYING SQUIRREL, INC., CHARLES GRACHAN, GRACHAN ENTERPRISES, INC., HENRY KUSZTELAK, UNCLE HENRY, INC., SONIA BRAR, RICK BRAR, BRAR MANAGEMENT LLC, NORMAN COHEN, and SUPER SUBS OF GURNEE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE QUIZNO'S FRANCHISE COMPANY LLC., QUIZNO'S FRANCHISING LLC, QUIZNO'S FRANCHISING II LLC, THE QUIZNO'S MASTER LLC, QFA ROYALTIES LLC, QZ FINANCE LLC, QIP HOLDER LLC, TQSC LLC, CERVANTES CAPITAL LLC, RICHARD E. SCHADEN, RICHARD F. SCHADEN, SCOTT MORTIER, ADAM GOLDFARB, DAVID GOLDBERG, CARL CURATOLA, DOMINICK VOSO, and STEVE ELLER, <br><br> Defendants. | No. 07 C 2170 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Quizno's is a fast-food restaurant known for its toasted submarine sandwiches. On April 19, 2007, six of Quizno's Illinois franchisees brought this class action against Quizno's Franchise Company, related entities, two corporate officers, and six of the company's Illinois employees.

In the complaint, Plaintiffs–each of whom claim to have suffered losses in connection with franchise agreements they signed with Quizno's–bring this class action against Quizno's, alleging ten claims for relief. The Plaintiffs assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Sherman Act, the Illinois Antitrust Act, the Illinois Franchise Disclosure Act of 1987, and the Illinois Consumer Fraud and Deceptive Business Practices Act, as well as claims for common law fraud, breach of contract, and breach of the covenant of good faith

and fair dealing. (Compl. ¶¶ 73-176.) Defendants have moved to dismiss all claims. For the reasons outlined below, Plaintiffs' federal civil RICO claims and Sherman Act Claims, as well as Plaintiffs' state common law fraud claim and antitrust claims, are dismissed.

## **BACKGROUND**

### **Plaintiffs' Federal Claims**

Plaintiffs assert two civil RICO violations (Counts I and II), each of which is based on a fraud allegedly perpetrated by Quizno's in connection with the parties' franchise agreement. First, Plaintiffs allege that the Defendants are an association-in-fact enterprise that asserts its control over franchisees by requiring them to pay inflated prices for products, services, and materials. (Compl. ¶¶ 3, 73-95.) The terms of the franchise agreement require franchisees to purchase products and materials necessary for the running of the franchise from either Quizno's or Quizno's-approved vendors. (*Id.* ¶ 3.) Plaintiffs allege that Quizno's sold these goods to franchisees at supra-competitive prices, and that Quizno's benefited either directly when they, or an affiliated company, sold the goods, or indirectly when an approved vendor sold the goods and Quizno's received a vendor rebate. (*Id.*)

Second, Plaintiffs allege that the association-in-fact enterprise induced Plaintiffs to purchase franchises by knowingly misrepresenting facts about the cost of maintaining the franchise, projected profits, and Quizno's policies and procedures. (Compl. ¶¶ 2, 96-123.) In support of this claim, Plaintiffs allege that Quizno's and its area directors made various misrepresentations to them concerning the profitability of the franchises and franchise operation costs. (*See, e.g., id.* ¶¶ 2, 100, 102.) Plaintiffs also claim that Quizno's fraudulently withheld information it was required to disclose, including the cost of goods Plaintiffs would need, and that Quizno's "failed to disclose the substantial markups and kickbacks that add to the prices of food, supplies, services and other materials that must be purchased from Quizno's or its approved suppliers." (Compl. ¶¶ 110(g), (k),

2

112(h), 114(h), 116(b), and 118(d).)  Both RICO claims are predicated on the same allegedly fraudulent conduct underlying Plaintiffs' common law fraud claim (Count VII).

Plaintiffs' final federal claim asserts a Sherman Act violation (Count III).  In that claim, Plaintiffs allege that Defendants violated the Sherman Act, 15 U.S.C. § 1, by requiring Plaintiffs to purchase necessary goods and services only from approved vendors.  (Compl. ¶¶ 124-137.) According to Plaintiffs, Quizno's exercises its substantial economic power within the "Quick Service Toasted Sandwich Restaurant Franchises market" to coerce franchisees to purchase essential goods from its affiliates and approved vendors.  (*Id.* ¶ 131.)  Plaintiffs claim that these tying arrangements are either illegal per se, or an unreasonable restraint of competition.  (*Id.* ¶¶ 135-36.) The same conduct underlying this federal antitrust claim also gives rise to Plaintiffs' claim that Defendants violated the Illinois Antitrust Act (Count IV).

**Governing Contractual Provisions**

In their motion to dismiss, Defendants argue that Plaintiffs' reliance on alleged misrepresentations regarding operating costs, marketing practices, and vendor rebates is unreasonable in light of the disclosures made in the Uniform Franchise Offering Circular ("UFOC") and the explicit terms of the franchise agreements.  As required by FTC rules and state laws, each franchisee receives a UFOC prior to execution of a franchise agreement.  The UFOC included cautionary language pertaining to any information given about the profitability as well as the costs of running a franchise:

> YOUR ACTUAL FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED. THE AVERAGE GROSS SALES FIGURES PRESENTED ABOVE REPRESENT SALES BEFORE DEDUCTIONS FOR CONTINUING ADVERTISING AND ROYALTY FEES PAYABLE TO THE FRANCHISER AND ALL OTHER OPERATING EXPENSES.  SEE ITEMS 6 AND 7 OF THIS OFFERING CIRCULAR FOR A PARTIAL LIST OF EXPENSES YOU WILL INCUR.
>
> THE SALES FIGURES ABOVE ARE AVERAGES OF HISTORICAL DATA OF SPECIFIC FRANCHISES.  THEY SHOULD NOT BE CONSIDERED AS POTENTIAL SALES THAT MAY BE REALIZED BY YOU.  WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ACHIEVE THESE SALES LEVELS.

> ACTUAL RESULTS VARY FROM RESTAURANT TO RESTAURANT, AND WE
> CANNOT ESTIMATE THE RESULTS OF ANY PARTICULAR FRANCHISE.

(UFOC at Item 19 (pp. 54-55), Ex. B to Quizno's Mem. (capitalization in the original).) Additionally, the UFOC expressly stated that potential franchisees should not rely upon any representations other than those outlined in the UFOC regarding the profitability of a Quizno's franchise.

> OTHER THAN THE ABOVE INFORMATION, WE DO NOT FURNISH OR
> AUTHORIZE OUR SALESPERSONS TO FURNISH ANY ORAL OR WRITTEN
> INFORMATION CONCERNING THE ACTUAL OR POTENTIAL SALES, INCOME
> OR PROFITS OF A QUIZNO'S RESTAURANT.

(*Id.* (p. 55).)

Within the UFOC that Plaintiffs received, Quizno's also made disclosures related to its relationship with suppliers:

> We and our affiliates have the right to receive payments from suppliers on account of their dealings with you and other Franchisees and to use the amounts we receive without restriction (unless we or our affiliates agree otherwise with the supplier) for any purpose we or our affiliates deem appropriate. We and our affiliates negotiate purchase arrangements with suppliers for the benefit of Franchisees, which often include volume discounts. Some suppliers pay us and/or our affiliates fees for products purchased through these negotiated agreements, and willingness to pay us and/or our affiliates may be a condition of our approval of a supplier.

(UFOC at Item 8 (p. 28).) The UFOC likewise estimated the costs that prospective franchisees would likely incur in connection with the initial investment. (*Id.* at Item 7 (pp. 23-24).) As explained above, Plaintiffs contend that Quizno's failed to disclose the markups and kickbacks that would be added to the prices of materials that franchisees were required to purchase from Quizno's or its affiliates. It is therefore notable that the UFOC repeatedly emphasizes that the costs are estimates. (*Id.* (pp. 24-26).)

In addition, a franchise agreement was included in the UFOC each franchisee received. The Franchise Agreement notified franchisees of potential marketing programs they might be required to take part in; each franchisee agreed to "participate in any promotion campaigns and advertising and other programs that the [Quizno's Marketing and Promotion] Fund periodically

4

establishes." (Franchise Agreement § 12.3(b), Ex. A to Quizno's Mem.) According to Quizno's, this constitutes disclosure of the vendor rebates, operating costs, and marketing programs in which Plaintiffs were required to participate. Indeed, the Franchise Agreement also expressly disclosed potential vendor rebates:

> Franchisor and its affiliates may receive payments from suppliers on account of such suppliers' dealings with Franchisee and other franchisees and may use all amounts so received without restriction and for any purpose Franchisor and its affiliates deem appropriate.

(Franchise Agreement § 13.4.)

Just as the UFOC cautioned Plaintiffs not to rely on representations not contained in the document itself, the Franchise Agreement contained an integration clause. Each franchisee signed an Illinois rider to the Franchise Agreement, thereby acknowledging that he, she, or it would not rely on any statements not contained in the UFOC or franchise agreement. (Franchise Agreement at Illinois Rider (§ 23.2).) The Franchise Agreement also contained provisions that urge franchisees to consult legal counsel, and require the franchisees to acknowledge the risks associated with the franchise and the fact that they could not rely on any representations made outside the UFOC and the agreement.

> 23.12 **Acknowledgment.** BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL. FRANCHISEE ACKNOWLEDGES THAT:
>
> (A) THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND
>
> (B) NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND
>
> (C) NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

(Franchise Agreement § 23.12 (capitalization in the original).)  These provisions came at the end of the Franchise Agreement, directly preceding the signature line.

Finally, each Plaintiff also signed a "Disclosure Acknowledgment Statement," acknowledging receipt of the Franchise Offering Circular and Exhibits, acknowledging awareness of business risks, and acknowledging that acceptance of the business risk was not conditioned on any guarantees from Quizno's.  That disclosure stated:

> 1.  The franchisee recognizes and understands that business risks, which exist in connection with the purchase of any business, make the success or failure of the franchise subject to many variables, including, among other things, the skills and abilities of the Franchisee, the hours worked by the Franchisee, competition, interest rates, the economy, inflation, Restaurant location, operation costs, lease terms and costs and the market place.  The Franchisee hereby acknowledges its awareness of and willingness to undertake these business risks.
>
> 2.  The Franchisee acknowledges receipt of the Franchisor's Uniform Franchise Offering Circular and Exhibits (collectively, the "UFOC").  The Franchisee acknowledges that it has had the opportunity to personally and carefully review these documents.  Furthermore, the Franchisee has been advised to seek professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise.
>
> 3.  The Franchisee agrees and states that the decision to enter into this business risk is in no manner predicated upon any oral representations, assurances, warranties, guarantees or promises made by the Franchisor or any of its officers, employees or agents (including any franchise broker) as to the likelihood of success of the franchise.  Except as contained in the Franchisor's UFOC, the Franchisee acknowledges that it has not received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted franchise sales, profits or earnings.  If the Franchisee believes that it has received any information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the UFOC, please describe these in the space provided below or write "None".

(Franchise Agreement at Disclosure Acknowledgment Statement.)

**<u>Wisconsin Litigation</u>**

In an almost identical case filed in the Eastern District of Wisconsin, Judge William Griesbach considered similar claims.  *Westerfield v. Quizno's Franchise Co.*, 527 F. Supp. 2d 840

(E.D. Wis. 2007). There, twelve Wisconsin Quizno's franchisees invoked RICO, the Sherman Act, and Wisconsin state law in an action against Quizno's. *Id.* at 844. The plaintiffs sought class certification for their claims. *Id.* There, as here, the plaintiffs' civil RICO claims were predicated on frauds Quizno's allegedly perpetrated with respect to the franchise agreement. *Id.* Indeed, based on Quizno's alleged misconduct, the plaintiffs in Wisconsin brought two RICO claims virtually identical to those raised by Plaintiffs in this action. *Id.* at 846. Quizno's moved to dismiss on the ground that the explicit disclosures given to franchisees "gutted" plaintiffs' claims. *Id.* at 844.

When assessing whether Quizno's did commit a fraud that might sustain a RICO claim, Judge Griesbach found Quizno's argument persuasive: "In the face of these clear and unambiguous disclaimers and non-reliance clauses, plaintiffs cannot plausibly claim that they reasonably relied on oral statements concerning likely profits and expenses in deciding whether to invest in a Quizno's franchise. [I]t is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." *Westerfield*, 527 F. Supp. 2d at 849 (collecting cases) (internal quotation marks omitted). Thus, the plaintiffs were not entitled to rely on representations made to them by Area Directors as the basis for their civil RICO claims. *Id.* Applying Wisconsin common law, Judge Griesbach also found the UFOC and Franchise Agreement rendered the plaintiffs' allegations of fraudulent omission unreasonable. *Id.* at 849-51. In the face of the UFOC and Franchise Agreement disclosures, it was not reasonable for the plaintiffs to rely on representations directly contradicted by the contract terms. *Id.* at 851. If the plaintiffs had a remedy against Quizno's, it would sound in breach of contract rather than in a RICO violation. *Id.* Quite simply, Judge Griesbach ruled that Quizno's conduct was "not fraud." *Id.* Thus, he dismissed the plaintiffs' civil RICO claims.

With regard to plaintiffs' Sherman Act claims, Judge Griesbach focused on the question of whether Quizno's had market power. Ultimately, he concluded that Quizno's enjoyed no "pre-contract market power over plaintiffs and other potential investors." *Westerfield*, 537 F. Supp.

2d at 858. In other words, the plaintiffs faced no pressure to become Quizno's franchisees. *Id.* at 859. Having chosen to become franchisees by signing the relevant agreements, plaintiffs were bound by the contract terms. *Id.* Again, any remedy they had against Quizno's would sound in contract, not in antitrust. *Id.* Thus, Judge Griesbach dismissed plaintiffs' Sherman Act claims.[1]

**This Action**

Plaintiffs filed this action on April 19, 2007. (Docket Entry No. 1.) On June 8, the Defendants moved to dismiss Plaintiffs' claims. The court concludes that Quizno's is correct that, in light of the explicit and comprehensive disclosures in the UFOC and Franchise Agreement, Plaintiffs cannot sustain any claim predicated on the contractual terms in question and dismisses Counts I and II (RICO), III (Sherman Act), IV (Illinois Antitrust Act), and VII (common law fraud). This includes all of Plaintiffs' federal claims. In general, when all federal claims have been dismissed prior to trial, the trial court should leave the pendent claims to the state courts. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994). If, however, it is clear that the state claims should be dismissed, the federal trial court should dismiss the pendent claims as well. *Id.* at 1251-52. Here, Plaintiffs' breach of contract claim, and claims arising under the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Illinois Franchise Disclosure Act are not obviously flawed, and therefore should be considered by an Illinois state court.

## DISCUSSION

**Jurisdiction**

The court has federal question jurisdiction over the RICO and Sherman Act claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

---

[1] Plaintiffs also point the court to additional authority: *Bonanno v. Quizno's Franchise Co.*, No. CIV.A. 06-CV-02358-WYD-KLM, 2008 WL 638367 (D. Colo. Mar. 5, 2008). There, Judge Wiley Daniel denied a motion to dismiss claims against Quizno's. But because that case deals exclusively with Colorado common law and statutory law, the court finds it minimally instructive in this context. (Docket Entry No. 77.)

§ 1367.

**Standard of Review**

When considering a motion to dismiss, the court tests the sufficiency of the complaint; it does not decide the merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). The plaintiff must plead sufficient facts to give fair notice of the claim and the grounds upon which it rests, and those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, "raising that possibility above a speculative level." *EEOC v. Concentra Health Serv., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (internal punctuation omitted); *see Bell Atlantic v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1964-65, 1973 n. 14 (2007). The court treats well-pleaded allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Plaintiffs' RICO claims, however, sound in fraud. The liberal notice-pleading standard does not apply to claims of fraud; such claims of fraud are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Pursuant to that Rule, "all averments of fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). Specifically, a claim of misrepresentation must spell out (1) the identity of the person(s) who made the representations; (2) the time, place, and content of the misrepresentation; and (3) the method by which the misrepresentation was communicated. *Vicom, Inc. v. Harbridge Merchant Servs.,* 20 F.3d 771, 777 (7th Cir.1994). The Seventh Circuit has described these requirements as the "who, what, when, where and how" of the circumstances of fraud or mistake. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990).

In addition, the court will consider the governing contracts among the parties when addressing Defendants' motion to dismiss. Federal Rule of Civil Procedure 10(c) provides that "[a] copy of any written instrument that is an exhibit to a pleading is a part thereof for all purposes." Although Plaintiffs did not attach the governing franchise agreement and related documents to their Complaint, " documents attached to a motion to dismiss are considered part of the pleadings if they

9

are referred to in the plaintiff's complaint and are central to his claim. " *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (citation and quotation marks omitted). Thus, as the franchising documents in this case are the "heart of [Plaintiffs'] lawsuit," the defense attached those documents to the motion to dismiss, and there is no dispute as to their contents, the court will independently examine the documents without converting the motion to dismiss into a motion for summary judgment. *McCready*, 453 F.3d at 891-92.

**Fraudulent Inducement and RICO Claims**

Plaintiffs have asserted three causes of action predicated on their allegation that Quizno's committed fraud against them: the two RICO claims discussed above (Counts I and II), and a fraudulent inducement claim (Count VII). All three fail because Plaintiffs cannot demonstrate that Quizno's committed fraud, given that there is no tenable argument that Plaintiffs reasonably relied on the alleged misrepresentations they set forth. Although reasonable reliance is normally a question of fact, a court can determine reasonable reliance as a matter of law when "when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 456, 813 N.E.2d 1138, 1142 (1st Dist. 2004) (quoting *Cozzi Iron and Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). In determining whether a party's reliance was reasonable, the court must consider all of the facts that the party knew, as well as those facts that the party could have discovered through the exercise of ordinary prudence. *Id.* at 456, 813 N.E.2d at 1143. Moreover, it is unreasonable for a party to rely on oral representations after stating in writing they are not relying on them. *Hardee's of Maumell, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir. 1994) (applying Indiana law).[2]

---

[2] Plaintiffs suggest that this standard may not apply here, as *Tirapelli* involved sophisticated parties. (Pls.' Resp. at 16.) The court is unwilling to label Plaintiffs unsophisticated consumers. In fact, in the context of an unconscionability analysis, the Seventh Circuit has differentiated business people who purchase franchises from vulnerable consumers or helpless
(continued...)

Plaintiffs allege that Quizno's committed fraud by failing to disclose certain key facts to them. But absent a duty to disclose, a defendant cannot be held liable for a failure to do so. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007). Under Illinois law, such a duty "arises only when a fiduciary relationship is present or when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension." *PXRE Reinsurance Co. v. Lumbermens Mut. Cas. Co.*, 342 F. Supp. 2d 752, 757-58 (N.D. Ill. 2004). The court concludes that no duty to disclose exists here. "It is well established under Illinois law that parties to a contract, including franchise contracts, do not owe a fiduciary duty to one another." *Oil Exp. Nat., Inc. v. Burgstone*, 958 F. Supp. 366, 370 (N.D. Ill. 1997) (citations omitted).

Turning to the specific allegations, Plaintiffs' claim is that Quizno's requires its franchisees to pay prices it knows to be higher than those the franchisees could get from third-party vendors for goods of equal or better quality, and that the prices the franchisees pay are deliberately inflated by kickbacks to the franchising entity. (Pls.' Resp. at 4.) According to Plaintiffs, this directly contradicts representations made in the UFOC that contracts with suppliers would be made for the benefit of franchisees. (*Id.* at 4-5.) Importantly, the UFOC does not say that the supplier contracts will be made for the sole benefit of franchisees. Instead, as explained above, the Franchise Agreement explicitly warned Plaintiffs that Quizno's might "receive payments from suppliers on account of such suppliers' dealings with Franchisee and other franchisees and may use all amounts so received without restriction and for any purpose Franchisor and its affiliates deem appropriate." (Franchise Agreement § 13.4.) The UFOC, similarly, warned Plaintiffs that Quizno's had "the right to receive payments from suppliers on account of their dealings with you and other Franchisees and

---

[2](...continued)
workers. *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999); *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992). This distinction is appropriate here.

11

to use the amounts we receive without restriction . . . for any purpose we or our affiliates deem appropriate." (UFOC at Item 8 (p. 28).) In light of these disclaimers, this court reaches the same result that Judge Griesbach did: "If Quiznos in fact imposed additional charges on its franchisees or charged them a higher percentage for such items as advertising or promotional costs than it promised, it may be liable for breach of contract. But in the face of these disclosures, plaintiffs' claim that the defendants induced them to purchase their franchises by fraudulently concealing such information cannot stand." *Westerfield*, 527 F. Supp. 2d at 851. In light of the explicit contractual provisions, it would be unreasonable for Plaintiffs to have assumed that Quizno's would not negotiate contracts with suppliers that would benefit Quizno's. And even if Quizno's did owe Plaintiffs a duty to disclose, these contractual provisions would clearly satisfy any such duty. Thus, the allegations of the Complaint do not establish that Quizno's committed fraud with respect to its franchisee's pricing.

Plaintiffs also contend that Quizno's fraudulently induced Plaintiffs to enter the Franchise Agreement through their misrepresentations and omissions. (Pls.' Resp. at 6-7.) But as set forth above, the UFOC and Franchise Agreement each contain disclaimers and non-reliance clauses that are repetitive and easily seen by any party who takes the time to read them. Faced with these "unambiguous" clauses, plaintiffs cannot have reasonably relied upon any oral statements concerning likely profits and expenses in deciding whether to invest in a Quizno's franchise. *See Westerfield*, 527 F. Supp. 2d at 849. Indeed, as explained above, Plaintiffs reviewed and even signed representations affirming that they would not rely on any statements outside the corners of the contractual documents. In fact, the UFOC explicitly warned Plaintiffs not to rely on any representations not contained in the document itself. (UFOC at Item 19 (pp. 54-55).) In the Franchise Agreement, each Plaintiff signed an integration clause agreeing not to rely on any statements not contained in the UFOC or Franchise Agreement. (Franchise Agreement at Illinois Rider (§ 23.2).) The Franchise Agreement also contained an Acknowledgment Clause, in which

Plaintiffs acknowledged that no statement, representation, act, event, or communication not contained in the document is binding on Quizno's. (*Id.* § 23.12.) The court concurs with Judge Griesbach that it is unreasonable for Plaintiffs to claim reliance on extra-contractual representations despite having stated in writing that they would not rely on representations outside the UFOC and Franchise Agreement. *Westerfield*, 527 F. Supp. 2d at 849.

Plaintiffs next suggest that the Franchise Agreement was unconscionable and, thus, inadmissible to defeat its Complaint. (Pls.' Resp. at 2-4.) In assessing whether a contractual provision should be disregarded as unconscionable, Illinois courts look to "the circumstances existing at the time of the contract's formation, including the relative bargaining positions of the parties and whether the provision's operation would result in unfair surprise." *CogniTest Corp. v. Riverside Publ'g Co.*, 107 F.3d 493, 499 (7th Cir. 1997). A contract is unconscionable when, viewed as a whole, "it is improvident, oppressive, or totally one-sided." *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191, 457 N.E.2d 1226, 1232 (1983). "The presence of a commercially unreasonable term, in the sense of a term that no one in his right mind would have agreed to, can be relevant to drawing an inference of unconscionability but cannot be equated to it." *River Valley Cookies*, 970 F.2d at 281 (citations omitted). Here, none of the clauses contained within the UFOC or the Franchise agreement can be seen as creating an unfair surprise. Before signing the Franchise Agreement, each Plaintiff was provided with the UFOC, which clearly disclosed the vendor rebates. *See We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999). Moreover, the Franchise Agreement specifically advised: "BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL . . . ." (Franchise Agreement § 23.12 (capitalization in the original).) Nor were Plaintiffs vulnerable consumers or helpless workers, but, rather, they were "business people who bought a franchise."

13

*Engen*, 180 F.3d at 843 (citation and quotation marks omitted).[3]

In a Sur-reply, Plaintiffs argue that new evidence undermines the viability of the non-reliance clauses on which the *Westerfield* court relied on dismissing their fraud claims. (Pls.' Sur-reply.) Plaintiffs apparently learned, after filing in Wisconsin, that Quizno's issued instructions requiring potential franchisees to write "None" on the space provided in the Disclosure Agreement under the section stating: "If the Franchisee believes that it has received any information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the UFOC, please describe these in the space provided below or write "None." (*Id.* at 9.) But it is unclear how this new evidence undermines the contract's non-reliance clauses. As Defendants point out, Quizno's corporate policy of requiring plaintiffs to state in writing, before they can enter into a franchise contract, that they have not received information regarding projected profits does not itself render the clause procedurally unconscionable. (Defs.' Sur-resp. at 6.) The policy does not undermine a potential franchisee's meaningful choice to enter into a Franchise Agreement. Rather, it shows more clearly that Plaintiffs had a clear choice, to "affirm that they were not relying on representations beyond those contained in the Franchise Agreement and UFOC or walk away and pursue another business opportunity . . . ." *Id.*

Because no affirmative fraud or fraud of omission has been adequately pleaded in this case, Plaintiffs' civil RICO claims and common law fraud claim are dismissed.

**Antitrust Claims**

Plaintiffs also allege that Defendants violated the Sherman Act, 15 U.S.C. § 1, and the

---

[3] In *Westerfield*, Judge Griesbach found the plaintiffs' claims of unconscionability unpersuasive. *Westerfield*, 527 F. Supp. 2d at 852-56. Under Wisconsin law, he found the Franchise Agreement to be neither procedurally nor substantively unconscionable. *Id.* Plaintiffs here argued in their Sur-reply that Illinois law regarding unconscionability is less stringent than Wisconsin law, and argued that *Westerfield* was distinguishable because Illinois requires only procedural *or* substantive unconscionability. Defendants, however, correctly point out that this argument hardly helps the Plaintiffs, as *Westerfield* found that neither procedural nor substantive unconscionability was present.

Illinois Antitrust Act, 740 ILCS § 10/1, by requiring Plaintiffs to purchase necessary goods and services only from approved vendors.[4]  "A tying arrangement is an agreement by one party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462 (1992) (citation and internal quotation marks omitted).  A tying arrangement violates the Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market."  *Id.*  Thus, "a tying agreement is not actionable unless the defendant has substantial market power in the tying product."  *Hardy v. City Optical, Inc.*, 39 F.3d 765, 767 (7th Cir. 1994).

Plaintiffs argue, first, that the appropriate time to debate the relevant tying market is at summary judgment, after discovery, rather than at the motion to dismiss stage.  (Pls.' Resp. at 22.)  Plaintiffs emphasize that "questions relating to the boundaries of a relevant market in antitrust cases are questions of fact, not issues of law for the Court."  (*Id.* (citing *Int'l. Boxing Club v. United States*, 358 U.S. 242 (1959).)  In most cases, market definition will require a factual inquiry into the commercial realities faced by consumers.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).  But Plaintiffs remain responsible for defining a relevant market at the complaint stage.  *Id.*  Additionally, given the pleading standard recently articulated in *Twombly*, if a complaint fails to set forth sufficient facts to show plausible grounds for belief that a violation has occurred, it may be dismissed.  127 S.Ct. at 1968, 1971.  And if Quizno's did not exercise substantial market power in a relevant product market, Plaintiffs' antitrust claim should not be permitted to continue into "its inevitably costly and protracted discovery phase."  *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J., sitting by designation).

---

[4]  Because Illinois' antitrust statute mirrors the Sherman Act, federal court decisions applying the Sherman act are persuasive authority in cases dealing with the Illinois Antitrust Act.  *See Ill. ex rel. Burris v. Panhandle E. Pile Line Co.*, 935 F.2d 1469, 1479-80 (7th Cir. 1991).

Here, Plaintiffs contend that the relevant market is for ownership interests in "Quick Service Toasted Sandwich Restaurant Franchises," and that Quizno's maintains substantial market power in that market. (Compl. ¶ 125.) This definition is too narrow. The relevant product market must include all "products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). When defining a market, one considers substitution by buyers and sellers. *Blue Cross & Blue Shield U. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2nd Cir. 2002) (products are considered reasonably interchangeable if consumers treat them as "acceptable substitutes" for one another). As Judge Griesbach held:

> From the perspective of sound analysis and consistency with the fundamental legal principle, it is patent that—at the minimum—a franchisor market power assessment requires reference to all alternatives available to the potential consumer in a broad line of business endeavors. In many cases this will extend to the market for franchises of all types or the employment of capital. For market power to exist there must be something that shows that, pre-contract, the seller had the power to force a potential franchisee to purchase something that would not have occurred in a competitive market—a requirement drawn directly from *Jefferson Parish* [*Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (U.S. 1984)].

*Westerfield*, 527 F. Supp. 2d at 858 (quoting Alan Silberman, *The Myths of Franchise "Market Power,"* 65 Antitrust L.J. 181, 206 (1996)).

Based on this analysis, Judge Griesbach found the market described by the Wisconsin plaintiffs (identical to the market definition in the Complaint here) to be "patently absurd." *Westerfield*, 527 F. Supp. 2d at 858. Under Plaintiffs' proposed definition, the seller of any franchise well-known for the product it produces has market power over investors who have already decided to sell that particular, well-known product. *Id.* This is not an appropriate definition of the relevant market. *See id.*; *Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 459, 512 (E.D. Mich. 1998) ("[T]he relevant tying market is no smaller than the pre-contract market for pizza or other fast-food carry out restaurants."). Assuming that a franchise can be a tying product, the market in

16

question should include all franchise opportunities any potential buyer would consider, not simply toasted submarine sandwich franchises. Indeed, the market Plaintiffs propose would appear to include Quizno's and only Quizno's. When a plaintiff alleges "a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

Instead, the "crucial question is whether Quiznos was in a position to coerce investors not otherwise determined to do so to purchase its franchise." *Westerfield*, 527 F. Supp. 2d at 858. There is no suggestion in the complaint that Quizno's was in such a position, or that it used any pre-contract market power to pressure the Plaintiffs into buying a franchise. Plaintiffs argue they purchased the Quizno's franchise because they were fraudulently induced to buy them, not because they felt market pressure. Additionally, Plaintiffs were required to buy the necessary products from Quizno's-affiliated and approved vendors not because they were forced to through overwhelming market power, but because of contractual obligations. *See Queen City Pizza*, 124 F.3d at 441. Thus, Plaintiffs have not suffered an antitrust harm, and their antitrust claims must be dismissed.[5]

## **CONCLUSION**

For the reasons set forth above, Defendants Motion to Dismiss (10) is granted. Plaintiffs' federal RICO claims (Counts I and II), federal Sherman Act claim (Count III), Illinois state antitrust claim (Count IV), and Illinois common law fraud claim (Count VII) are dismissed without prejudice. Plaintiffs are given leave to amend their Complaint within thirty days. Unless and until Plaintiffs do so, having dismissed all of Plaintiffs' federal claims, the court suggests that the pendant state law

---

[5] Plaintiffs' assertion that Quizno's conceals the restrictions it will ultimately place on franchisees (Pls.' Resp. at 28), ultimately fails. As discussed above, there is no evidence that Quizno's concealed these restrictions, either fraudulently or innocently.

claims be addressed by the state courts.

ENTER:

Dated: March 31, 2008

_____
REBECCA R. PALLMEYER
United States District Judge