UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

ILENE SIEMER, et al.,

    INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
    SIMILARLY SITUATED,

                Plaintiffs,                                  Case No. 07-CV-2170

vs.

THE QUIZNO'S FRANCHISE COMPANY LLC F/K/A THE
QUIZNO'S CORPORATION, et al.,

                Defendants.

---

**PLAINTIFFS' BRIEF OPPOSING OBJECTION OF
GARY AND JILL GEVAART AND GLOBE FOOD SERVICES LLC
TO PROPOSED CLASS ACTION SETTLEMENT**

---

## INTRODUCTION

More than 8,000 current and former Quiznos franchisees were sent notices of the settlement of this class action litigation. Out of these thousands of people, only one franchisee has objected to the terms of the settlement agreement—Gary and Jill Gevaart and Globe Food Services LLC, the company they formed to carry on their business (collectively, "the Gevaarts" or "the objectors"). The Gevaarts closed their store owing no money to Quiznos, and they contend that, because they do not benefit from the settlement agreement's proposed release of class members' past due obligations, the cash payment they will receive as former franchisees is unfair and inadequate, especially in light of the $50,000 incentive awards that the franchise operator representative plaintiffs will receive.

The Gevaarts' objections are groundless. Their argument completely ignores the settlement agreement's provision releasing Quiznos' claims for lost future royalties against class members who, like the Gevaarts, closed their stores before the initial 15-year franchise term had expired. This benefit is worth hundreds of thousands of dollars to the Gevaarts alone. And if the Gevaarts truly believe the settlement does not adequately compensate them, they had the right to opt out and pursue those supposedly undervalued claims on their own.

The Gevaarts' challenge to the incentive fee is likewise unavailing. The franchise operator plaintiffs devoted substantial time to the preparation and litigation of these cases, and they achieved impressive results in the settlement agreement despite some significant adverse court decisions during the four-plus years of litigation that preceded settlement. Moreover, the plaintiffs reasonably feared that stepping forward to litigate might subject them to adverse action by Quiznos, a factor that has uniformly been held to warrant significant incentive payments to representative plaintiffs.

We emphasize, finally, what this brief will and will not do. Plaintiffs will not here defend the overall fairness of the settlement, nor will they present all of the facts pertinent to that fairness evaluation. Consistent with the schedule set forth in the settlement agreement and adopted by this Court on November 20, 2009, those are matters for another day.[1]

Instead, this brief will address three principal issues: (1) the Gevaarts' challenge to the adequacy of the settlement as to Class III members (Quiznos franchisees who had operated restaurants but closed them as of November 20, 2009); (2) the Gevaarts' contention that the proposed $50,000 incentive fee payable to franchise operator representative plaintiffs is, as they

---

[1] Among other things, plaintiffs will submit expert testimony regarding the value of all aspects of the settlement, including the extensive modification to Quiznos' business relationship with is franchisees.

2

conclusorily put it, "facially . . . excessive" (Objectors' Memorandum at 13); and (3) whether the objectors should be permitted to take discovery.[2]

## ARGUMENT

### I. SETTLEMENT BENEFITS TO CLASS III FRANCHISE OPERATOR PLAINTIFFS ARE SUBSTANTIAL AND REASONABLE.

The Gevaarts contend that the benefits available to Class III members are inadequate as to those members of this subclass who, like the Gevaarts, incurred personal debt to ensure that they owed no money to Quiznos when they closed their stores and who therefore do not benefit from the settlement's proposed release of Quiznos' claims to recover those past due royalties. (Objectors' Memorandum at 2.) In light of the incentive awards to named plaintiffs, they assert that Class III members who owed nothing to Quiznos when their stores closed were effectively unrepresented in the settlement negotiations, because they do not benefit from the release of past due obligations and the only benefit they receive is the $1,700 payment, which they summarily dismiss as "unreasonable and inadequate." (Objectors' Memorandum at 2.)

For several reasons, the Gevaarts' objection is baseless. First, they altogether ignore the substantial benefit conferred on Class III members by the settlement agreement's release of Quiznos' claims for the present value of lost future payments over the unexpired term of the Class III members' franchise agreements. (Settlement Agreement, § 4.6.) This is a substantial omission that can hardly be chalked up to inadvertent oversight; the Gevaarts' own brief references the release of these future claims (at pp. 7-8), but then proceeds to discuss the settlement agreement as if the benefit did not exist.

---

[2] Plaintiffs do not contest the objectors' motion to intervene, so this brief does not address that issue. By not opposing the motion to intervene, we do not concede that the Gevaarts' interests were inadequately represented in the litigation and in the settlement negotiations. As this brief demonstrates, the objectors' contention to that end is demonstratively false.

3

Notably, the Gevaarts provided enough information with their own filings to enable plaintiffs and this Court to estimate the value of the benefit to the Gevaarts alone. The standard terms of a Quiznos franchise agreement is 15 years. (6/8/07 Def. Brf. Exh. B [Doc. 12-1] Franchise Agreement, § 17.1.) The franchise agreement also gives Quiznos the right to seek damages should a franchisee's default cause termination of the agreement:

> The parties further agree that, in addition to such other damages awarded by the court, if this Agreement is terminated because of a *Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the net present value of the Royalties and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for Franchisee's default.* Royalties and Marketing and Promotion Fees for purposes of this Section shall be calculated based on the Restaurant's average monthly Gross Sales for the twelve (12) months preceding the termination date.

(Franchise Agreement, § 21.3.) (Emphasis added.)

Jill Gevaart says she and her husband signed their franchise agreement on September 16, 2005, and closed their Quiznos on April 20, 2008. (J. Gevaart Decl. ¶ 2.) Ceasing to operate the restaurant for five consecutive days is a default under § 18.2(d) of the franchise agreement, which triggers the lost future payments liability imposed by § 21.3.

Had the Gevaarts kept their restaurant open for the entire 15-year term of the Franchise Agreement, the agreement would have expired September 16, 2020. But they closed the restaurant much earlier, on April 20, 2008—to be precise, 12 years and 149 days short of the 15-year contractual term. If we credit Ms. Gevaart's calculation of $34,000 for the "annual combined assessment for the royalty fee, marketing and promotion fee and local advertising fee" (J. Gevaart Decl. ¶ 4) as accurate, then the Gevaarts would have owed Quiznos approximately $421,940 over the unexpired term of their franchise agreement but for their decision to close it.

4

The release negotiated by class counsel and provided by § 4.6 of the settlement agreement thus benefitted the Gevaarts to the tune of about $311,000—the present value of the future payments the Gevaarts owed Quiznos pursuant to § 21.3 of their franchise agreement.[3]

Thus, the central premise of the objectors' analysis—that the settlement provides no significant benefits to Class III members who had paid their past obligations in full—is just plain wrong. The fact that the Gevaarts have identified a potential theoretical basis for another subclass is irrelevant given the fact that Class III as defined provides significant benefits to all of its members. "[I]f every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair." *UAW v. General Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007).

Second, the Gevaarts' objection fails because, at its heart, it is merely a complaint that the settlement is too low for their liking. They have a simple remedy: they should have opted out, which the settlement agreement expressly gave them the right to do. Indeed, this Court would be justified in denying intervention altogether on that basis:

> Where an alternative method of adequately protecting one's interest exists, denial of intervention as of right is not an abuse of discretion. Given that Savage could have opted out of the class action, the disposition of the action would not have impaired her ability to protect her interest.
>
> [* * *]
>
> Objectors were informed repeatedly of their right to opt out of the class settlement if they were unhappy with the terms of the

---

[3] This is not just rhetoric. In *Bonanno, et al. v. The Quizno's Franchise Company LLC, et al.*, Case No. Case No. 06-CV-02358-CMA-KLM (United States District Court for the District of Colorado) (the "Bonanno Action"), Quiznos filed a counterclaim against each representative plaintiff based on their alleged failure to open stores and the loss of 15 years' worth of royalties and advertising fees. In doing so, the company relied on § 21.3 of the franchise agreement. None of the franchise operator cases reached the stage where Quiznos had the opportunity to assert similar counterclaims, but there is little doubt that Quiznos would have done so.

5

> settlement. Despite the Court's repeated admonition, Objectors remained in the class and now seek to undo the agreement which plaintiffs and the *vast* majority of class members find satisfactory.

*Downey v. Mortgage Guaranty Ins. Corp.*, 2001 WL 34092617 at *3 (S.D. Ga., Oct. 1, 2001) (italics in original), *vacated and remanded on other grounds*, 313 F.3d 1341 (11th Cir. 2002); *see also Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 142-43 (D. Ky. 1992) (rejecting objection that class action settlement compensation was inadequate because any class member who believed his claim was viable was given a reasonable opportunity to opt out of the class). The Gevaarts have sophisticated counsel who obviously reviewed the settlement agreement in detail. If the Gevaarts believed the settlement agreement provided too little compensation for what their claims were worth on their merits, they could have opted out and obtained that greater value in their own suit. The opt out procedure would have given them everything they wanted.

Third, the Gevaarts' submission ignores several substantial obstacles to the success of former franchisees' claims inapplicable to franchisees who have continued to operate their stores. Although the Gevaarts contend that the settlement for Class III members is "unreasonable and inadequate," they make no effort to evaluate the strengths and weaknesses of Class III members' claims.[4] To determine whether a class action settlement should be approved, the district court must make some evaluation of the ultimate likelihood of success of the plaintiffs' claims. *See In re Mexico Money Transfer Litigation*, 267 F.3d 743, 748 (7th Cir. 2001).

Here, although plaintiffs believe the Class III claims were strong, there are several significant factors on the other side of the scale. Perhaps most important is the difficulty

---

[4] Additional discovery would not be necessary for the Gevaarts to do this. The public record contains extensive briefing of the legal issues surrounding the parties' claims and defenses. If they need factual information, the objectors can review the extensive discovery materials exchanged by the parties (assuming that the objectors will submit to the terms of the stipulated protective orders in place).

6

plaintiffs would have had in obtaining class certification in light of Judge Arguella's April 20, 2009 decision upholding Quiznos' contractual prohibition against class actions in the Bonanno Action and the Tenth Circuit's subsequent refusal to grant interlocutory review of that decision. (Settlement Agreement, p. 5.)

Standing alone, the class action bar as enforced by the courts provides trouble enough. But the franchise agreement contains other provisions that Quiznos would have used in attempts to limit or extinguish the claims of Class III members like the Gevaarts. Some of these include the limitation of damages to a single year's net profits (§ 21.3), and the substantial counterclaims for lost future royalties discussed above (§ 21.3). The Gevaarts' apparent assumption that pursuing Class III members' claims should have been a walk in the park ignores the extensive litigation history, and is simply incorrect.

## II. THE INCENTIVE AWARDS ARE NOT EXCESSIVE.

In a classic case of the pot calling the kettle black, the Gevaarts turn up the rhetoric and claim that plaintiffs have failed to justify the $50,000 incentive payments, which "facially appear excessive." (Objectors' Memorandum at 13.) They do not discuss the case law's criteria for evaluation of such payments, presenting instead a series of decisions that might lead this Court to believe that $10,000 is the maximum permissible incentive payment to a class action plaintiff.

Of course, the objectors simply ignore case law that undermines their position. The $50,000 proposed payment pales in comparison to the $303,000 incentive awards approved by the district court in *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001). Other courts have likewise readily approved awards higher than the $50,000 sought here. *See e.g., In re Revco Securities Litigation*, 1992 WL 118800 (N.D. Ohio 1992) and 1993 WL 497208 (N.D. Ohio 1993) (approving $200,000 incentive award); *Roberts v. Texaco, Inc.*, 979 F. Supp. 189,

203-04 (S.D.N.Y. 1997) (approving $85,000 incentive award). Still other decisions have approved incentive payments equal to the $50,000 proposed here. *E.g., In re Dun & Bradstreet Credit Services Customer Litigation*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) ($55,000); *Van Vraken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D. Cal. 1995) ($50,000); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) ($50,000). *DeSantis v. Snap-On Tools Co. LLC*, 2006 U.S. Dist. LEXIS 78362 at *34-35 (D.N.J., October 27, 2006) ($50,000).

The Seventh Circuit has established the criteria for evaluating an incentive award: "[T]he actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). In the same case, the Court of Appeals affirmed the incentive award because, "[m]ost significantly, the special master found that, in filing the suit, Cook reasonably feared workplace retaliation." *Id.*

Measured against these criteria, the $50,000 incentive awards are well within the range of reasonableness. First, plaintiffs have obtained substantial benefits for the class. As shown above, the Class III members who get the smallest payments and do not benefit from system-wide improvements get releases from what in most instances are hundreds of thousands of dollars in potential liability for lost future royalties and other payments. The Class I members get not only the food credits specified in the settlement, but $19 million worth of additional advertising spending, and substantial beneficial changes to the Quiznos system, including the establishment of an independent franchisee association, direct franchisee input to advertising decision makers, independent third-party review of system food and supplies pricing, a formal grievance resolution procedure, and many more significant positive changes to their business

relationship. Especially in light of the significant blow dealt to all the class claims by the class certification decision in the Bonanno Action, the results achieved by the plaintiffs are impressive and warrant a substantial reward.

Second, the plaintiffs invested substantial time and effort working with the attorneys on investigation and litigation strategy, preparing for traveling to depositions and being deposed, and participating in written discovery and document production. These contributions are summarized in Section 10.3 of the settlement agreement. Plaintiffs are in the process of assembling the detailed data establishing the extent of their individual participation in all aspects of the litigation and will submit that information in accordance with a schedule set by the Court, in order that the facts surrounding this issue will be part of the record well before the final fairness hearing on June 30, 2010.

Third, the plaintiffs reasonably harbored fears that they would suffer from retaliation at Quiznos' hands. Although we found no cases approving incentive fees in franchise class actions on this basis, the fear of retaliation is often cited in employment discrimination class actions, which are strongly analogous to the franchise context because of the vulnerability of franchisees in a continuing relationship with a franchisor: "In discrimination-based litigation, the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril." *Roberts*, 979 F. Supp. at 201.

Here, plaintiffs had concerns that Quiznos would pursue them for taking a public stand in court against the company. (Campbell Decl. ¶¶ 5-6; Grachan Decl. ¶ 3.) Some had firsthand experience with what they considered aggressive conduct by Quiznos. Charles Grachan was told

9

that his franchise would be terminated if he closed his store over the Fourth of July (Grachan Decl. ¶ 2), while John Schodron had previously been sued by Quiznos for allegedly defaming the company in comments posted on a message board. (Schodron Decl. ¶¶ 4-7.)

Quiznos' litigation history also was significant to plaintiffs as they considered whether to join the lawsuits. Anthony Bonanno feared a claim for lost future royalties, which fear ultimately came true when Quiznos counterclaimed against Mr. Bonanno (and the other class representatives in the Bonanno Action) and he had to report the claim to regulatory authorities because of his employment in the financial services industry. (Bonanno Decl. ¶¶ 5-7.) Michael Campbell heard about the lawsuits Quiznos filed in 2006 against franchisees like John Schodron who had posted criticisms of Quiznos on a message board. (Campbell Decl. ¶ 3.)

Also significant to the plaintiffs was Quiznos' December 2006 termination of the franchises of the Board of Directors of the Toasted Subs Franchisee Association ("TSFA"), an organization formed to express concerns of member franchisees, after the TSFA posted the suicide note of Bob Baber, a former Quiznos franchisee, on its website. (Campbell Decl. ¶ 4.) Quiznos then sued the board members (and the board members filed their own suit), and a federal district court in Denver ultimately enjoined the terminations, noting that "Quiznos house counsel Meyers made clear in his testimony that Quiznos's actions in terminating TSFA board members' franchises were purely punitive." *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1251 (D. Colo. 2007).

Quiznos unquestionably views its litigation history as legitimate efforts to protect its legal rights and maintain the integrity of its franchise system. This Court need not decide who was right in these franchisor-franchisee battles, any more than it must conclusively decide the merits of the substantive claims and defenses as a condition of approving the settlement in this case.

Rather, this evidence, and the subjective beliefs of the plaintiffs showing that they took (in their minds at least) courageous stands against an aggressive franchisor, support the agreed-upon incentive awards of $50,000 because plaintiffs reasonably believed that if they became part of these cases, they risked significant adverse action by Quiznos.

### III.  THERE IS NO BASIS FOR ALLOWING DISCOVERY.

The Gevaarts suggest that, under Seventh Circuit precedent, it would be an abuse of discretion to refuse them the right to conduct discovery into the negotiations that led to the settlement agreement. (Objectors' Memorandum at 14.) The argument is at best misleading, and falls far short of the showing needed to grant discovery rights to an objecting party.

The only case that the Gevaarts cite to support their "no settlement discovery is an abuse of discretion" position is *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1125 (7th Cir. 1979). It is interesting that, although objectors' counsel managed to dig back 31 years to find *General Motors*, they missed the Seventh Circuit's subsequent discussion of that decision in *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987):

> Discovery of settlement negotiations in ongoing litigation is unusual because it would give a party information about an opponent's strategy, and it was not required in the circumstances of this case . . . . ***Such discovery is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive,*** as in the *General Motors* case, where negotiations with one class counsel were carried out in violation of the district court's order.

(Emphasis added.) Against the clear mandate of *Mars Steel*, the Gevaarts seek the extraordinary and intrusive step of settlement-negotiations discovery based on . . . nothing at all. Instead, they apparently believe that their status as objectors automatically grants them a license to probe.

11

Not so. Even if *Mars Steel* were not binding precedent requiring actual evidence of collusion before class action settlement negotiations are opened to discovery (and it most certainly is) other courts follow this rule and cite *Mars Steel* as its source. *See e.g., Lobatz v. U.S. West Cellular of California, Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 146 (S.D. Ohio 1992). Although this issue should be closed simply by virtue of the objectors' utter failure to point to any "other sources" even hinting at collusion in the settlement process, it is worth noting that both of the eminent mediators who worked with the parties in this case—the Honorable Dickran M. Tevrizian and Attorney Michael L. O'Donnell—concluded that there was no collusion in the settlement negotiations. (Tevrizian Decl. ¶ 7; O'Donnell Decl. ¶ 7.)

Indeed, the Gevaarts have not even made the minimal showing necessary to obtain any discovery whatsoever. "Objectors should be allowed 'meaningful participation in the fairness hearing without unduly burdening the parties or causing an unnecessary delay.'" *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 619 (S.D. Cal. 2005), *quoting In re Domestic Air Transp. Antitrust Litigation*, 144 F.R.D. 421, 424 (N.D. Ga. 1992). "Objecting class members . . . do not have a vested 'entitle[ment] to discovery.'"*Int'l Union*, 497 F.3d at 636, *quoting In re General Tire & Rubber Co. Sec. Litigation*, 726 F.2d 1075, 1084 n. 6 (6th Cir. 1984). "A district court . . . need grant objectors discovery only if they can make a colorable claim that the settlement should not be approved." *Int'l Union*, 497 F.3d at 636. As this brief demonstrates, the Gevaarts' objections to the settlement are so weak that this Court should not impose the costs of discovery—with their attendant risk of delay in getting the class members the settlement benefits to which they are entitled—on the plaintiffs and defendants. The objectors have mounted no serious challenge to any aspect of the settlement agreement.

Finally, in evaluating the request for discovery, it is important that the Gevaarts literally stand alone. The administrator appointed by this Court mailed 8,468 notices to class members, and the Gevaarts are the *only objector*. "[W]here the objectors represent only a small percentage of the class, the likelihood of the court granting their discovery requests decreases because the court will give great weight to the interests of the majority of the class members." *Hemphill*, 225 F.R.D. at 620; *see also* A. Conte and H. Newberg, *Newberg on Class Actions* § 11.57 at 186 (4th ed. 2002). The request for discovery should be denied.

## CONCLUSION

The settlement agreement in this case was reached after more than four years of litigation, extensive motion practice, the production and review of millions of pages of documents, 80 depositions, six days of intense mediation with two different and highly accomplished mediators, and months of negotiating nuances of contractual language necessary to enable the settlement to occur. The Gevaarts' objection completely ignores one substantial benefit conferred by the settlement—worth about $311,000 in present value *to them alone*—and their request for discovery misstates Seventh Circuit precedent. If the Gevaarts honestly believed their claim was worth more than the benefits they will receive under the settlement, they could have opted out. Instead, they are engaged in a quixotic effort to block a settlement that provides substantial benefits to the class. The objection should be overruled.

Dated this 1st day of March, 2010.

KRAVIT HOVEL & KRAWCZYK S.C.

*s/ Mark M. Leitner*
Stephen E. Kravit, Esq.
Joseph S. Goode, Esq.
Mark M. Leitner, Esq.
825 North Jefferson Street

Milwaukee, Wisconsin 53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135
*Attorneys for Plaintiffs*

*s/ Justin M. Klein*
Gerald A. Marks, Esq.
Justin M. Klein, Esq.
Marks & Klein, LLP
63 Riverside Avenue
Red Bank, New Jersey 07701
Telephone: (732) 747-7100
Facsimile: (732) 219-0625

**CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

 justin@marksklein.com

 Jerry@marksklein.com

 lmacphee@perkinscoie.com

 goode@kravitlaw.com

 andrew.bleiman@chengcohen.com

 fredric.cohen@chengcohen.com

 sshepherd@sfmslaw.com

             *s/ Mark M. Leitner*
             Mark M. Leitner, Esq.
             Kravit, Hovel & Krawczyk, S.C.
             825 North Jefferson Street
             Milwaukee, Wisconsin 53202
             Telephone: (414) 271-7100
             Facsimile: (414) 271-8135