UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILENE SIEMER, et al.,

      INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
      SIMILARLY SITUATED,

               Plaintiffs,                    Case No. 07-CV-2170

      vs.

THE QUIZNO'S FRANCHISE COMPANY LLC F/K/A THE
QUIZNO'S CORPORATION, et al.,

               Defendants.

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, ATTORNEY FEE AWARD, AND OTHER RELIEF

## INTRODUCTION

The efforts of the representative plaintiffs, the defendants, and their respective counsel have yielded a class action settlement that provides more than $200 million in benefits for the franchisees of the Quiznos submarine sandwich brand and the franchise system as a whole. The settlement puts millions of dollars in cash into franchisees' pockets and into advertising funds for their direct benefit, and achieves far-reaching improvements to the Quiznos System. Among those improvements are the creation of an Independent Association of Franchisees recognized by Quiznos as the representative of its franchisees, the creation of an Advertising Advisory Council that will give franchisees an opportunity to voice their views on advertising expenditures to Quiznos, and an annual independent audit of food and supply costs within the Quiznos System.

The settlement also provides for more than $19 million in additional ad spending by Quiznos, over half of which must be local.

The settlement has been well received by the franchisee community.  Of more than 8,468 franchisees and former franchisees who were sent notice of the settlement, only *one* filed an objection, which is substantively meritless.

It is now time for this Court to join the parties, their counsel, and the class members and place its final approval on the settlement.  The Court should also approve the incentive awards to representative plaintiffs and franchisees who helped further the lawsuits, the attorney fees to be paid by Quiznos to Class Counsel, and the litigation expenses that have been submitted for reimbursement.

## SUMMARY OF SETTLEMENT TERMS

The SNO portion of the settlement gives SNO Class Members who wish to participate in the settlement a choice:   they can remain in the Quiznos System and receive a credit in the amount of the franchise fee they originally paid (usually $25,000) toward the purchase of equipment and supplies needed to open and run their restaurants.[1]  Alternatively, SNO Class Members can elect to leave the Quiznos System and receive a refund of between 5% and 32.7% of their initial franchise fee, depending upon when they purchased their Quiznos franchise.  Even those SNOs who have previously settled their disputes with Quiznos will receive some compensation under the settlement, either $500.00 or $250.00, depending on the terms of their previous settlements with Quiznos.  Finally, SNO Class Members will benefit from a release by Quiznos of all of its claims against them, including but not limited to, claims seeking future lost profits caused by their failure to open restaurants.

---

[1] All defined terms in this submission are as defined in Section II of the October 27, 2009 Class Action Settlement Agreement and Release (the "Settlement Agreement").

Franchise Operator Class Members will receive monetary benefits, depending on whether a particular class member remains in the Quiznos System operating a restaurant or has exited the system as of the Preliminary Approval Date. Franchise Operator Class Members who are still in operation will receive $3,150.00 in credits on food purchases from Quiznos over a three-year period. Franchise Operator Class Members who transferred their franchises to other persons will receive $475.00, and Class Members who have ceased operations as of the preliminary approval date will receive $1,700.00.

In addition, under the settlement, Quiznos releases current and former operators, and SNO Class Members who elect to remain in the Quiznos System and open restaurants, who currently owe money to Quiznos. The estimated cash benefit to Class Members of this release is approximately $4.84 million (based on present value calculations).

Finally, the settlement provides significant benefits over and above direct financial benefits to franchisees who continue to operate Quiznos restaurants:

- Quiznos will contribute $19.4 million to the franchisees' advertising and marketing trust funds, $10 million of which must be spent on local advertising;

- For the first time in its history, Quiznos will recognize an independent association of franchisees, and will provide funding to incorporate the association and for its initial operations;

- The creation of an Advertising Advisory Council, through which franchisees will have the opportunity to give their input

- Annual review by an independent third-party auditor of Quiznos' food and supplies prices charged to franchisees as compared with prices available through other supply routes;

- A formal dispute resolution program to address franchisee grievances;

- A formal program to assist franchisees who want to sell their stores and to aid franchisees who want to acquire more stores in the Quiznos System;

- A formal program to streamline and standardize the process through which franchisees can request Quiznos' approval to use food and service suppliers other than the ones mandated by Quiznos;

- Changes in Quiznos' Franchise Disclosure Document ("FDD") that clarify the role of Quiznos'-owned entities in the supply chain to Quiznos franchisees;

- Financial assistance to franchisees to help cover the cost of materials needed to participate in a contemplated national delivery program;

- A formal program for considering franchisee requests for waivers of Quiznos' maximum pricing policies;

- A retraining program to educate franchisees about the requirements of operating a Quiznos restaurant;

- A formal program through which Quiznos will monitor the backlog of SNO franchisees who have not yet found sites for their restaurants; and

- A program to assist SNO franchisees to locate sites for their restaurants.

## PROCEDURAL HISTORY

The SNO Class Action was originally brought in the Superior Court for the State of New Jersey on February 16, 2006.  Defendants removed it to the United States District Court for the District of New Jersey.  The case, captioned *Bonanno, et al. v. The Quizno's Franchise Company LLC, et al.*, was subsequently transferred to the United States District Court for the District of Colorado, where it remains pending as Case No. 06-CV-02358-CMA-KLM.  The complaint in the SNO Class Action, as amended on August 1, 2007, asserts claims for violation of the Colorado Consumer Protection Act, fraudulent inducement, breach of contract, violations of the covenant of good faith and fair dealing, unjust enrichment, common law conspiracy, economic duress and declaratory judgment.  Quiznos moved to dismiss all of the claims in the SNO Class Action, which motion was denied in its entirety on March 5, 2008.  The defendants answered the complaint and asserted counterclaims against the SNO Representative Plaintiffs on September 30, 2008.  The SNO Representative Plaintiffs moved to dismiss the counterclaims on November 3, 2008.  That motion remains pending.

On September 30, 2008, the SNO Representative Plaintiffs moved, pursuant to Fed. R. Civ. P. 23, for class certification.  Defendants opposed the motion, and filed materials in

opposition. After significant briefing and supplemental briefing, the Court, the Honorable Christine M. Arguello, presiding, heard oral argument and then issued a written decision denying the motion for class certification on April 20, 2009. The SNO Representative Plaintiffs sought leave to immediately appeal the order denying class certification, and their request for leave was denied by the Court of Appeals for the Tenth Circuit on June 29, 2009. Since the denial of class certification and the request for leave to appeal, the SNO Class Action has been stayed by stipulation of the parties and an order implementing that stipulation.

The Franchise Operator Class Action Litigation has been pursued primarily in three courts.[2] The first of those was filed in the United States District Court for the Eastern District of Wisconsin, Green Bay Division, on November 20, 2006, captioned *Westerfield, et al. v. The Quizno's Franchising Company, LLC, et al.*, Case No. 06-C-1210 (the "*Westerfield Action*"). The representative plaintiffs in the *Westerfield Action* sought to represent a class of all Quiznos operators in the State of Wisconsin.

On April 19, 2007, a group of plaintiffs filed suit in the United States District Court for the Northern District of Illinois, Eastern Division, captioned *Siemer, et al. v. The Quizno's Franchising Company, LLC, et al.*, Case No. 07-C-2170 (the "*Siemer Action*"). The representative plaintiffs in the *Siemer Action* sought to represent a class of all Quiznos operators in the State of Illinois.

Finally, on August 14, 2007, a number of representative plaintiffs brought suit in the United States District Court for the District of Colorado, captioned *Brunet, et al. v. The Quizno's Franchising Company, LLC, et al.*, Case No. 07-CV-01717-PAB-KLT (the "*Brunet Action*").

---

[2] We say "primarily" because Class Counsel did file a case in the United States District Court for the Eastern District of Michigan on February 23, 2007 captioned *McDonald, et al. v. The Quizno's Franchising Company, LLC*, Case No. 2:07-CV-10838 (the "*McDonald Action*"). For strategic reasons, Class Counsel chose to voluntarily dismiss that action on September 6, 2007. (Goode Decl. ¶ 4.)

The representative plaintiffs in the *Brunet Action* sought to represent a class of all Quiznos franchisees in the United States, excepting those in Wisconsin and Illinois. Ultimately, they sought to protect the rights of operators in Michigan after the voluntary dismissal of the *McDonald Action* on September 6, 2007.

Each of the Franchise Operator Class Actions—the *Westerfield Action*, the *Siemer Action*, and the *Brunet Action*—alleged claims for violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), fraud in the inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, economic duress, breach of fiduciary duty, and declaratory judgment. Each of the cases also asserted various claims based on specific statutes of the forum state—Wisconsin in the *Westerfield Action*, Illinois in the *Siemer Action*, and Colorado in the *Brunet Action*. On October 15, 2008, the defendants simultaneously moved to dismiss amended complaints in each of three cases comprising the Franchise Operator Class Action Litigation. Those motions are fully briefed and remain pending as of today. In addition, on February 9, 2009, the representative plaintiffs in the *Brunet Action* filed a motion for class certification, which motion remains pending as well. Like the SNO Class Action, each of the Franchise Operator Class Actions has been stayed by stipulation and order since the Tenth Circuit's denial of the SNO Representative Plaintiffs' request for leave to appeal Judge Arguello's April 20, 2009 decision denying their motion for class certification.

All four of the cases have been vigorously and thoroughly litigated. The defendants moved to dismiss all of the claims in all of the cases, both as originally pled and in amended complaints, and those motions were fully and extensively briefed (albeit never decided as to the amended complaints in the three Franchise Operator cases). The defendants in the SNO Class Action moved for summary judgment on March 9, 2009, and that motion likewise remains

pending.  The parties engaged in extensive discovery throughout 2006, 2007, 2008 and 2009; all told, Quiznos produced millions of pages of documents, most of which were produced in electronic form and stored by plaintiffs in a searchable database which was used extensively to prepare for depositions and briefing on motion practice.  Each of the representative plaintiffs in the SNO Class Action and the majority of the 45 representative plaintiffs in the Franchise Operator cases were deposed, and all of the representative plaintiffs in all cases produced documents and participated extensively in propounding and responding to written discovery, assisting Class Counsel in factual development, and maintaining regular and frequent contact with Class Counsel regarding case developments and needs.

Class Counsel took the depositions of dozens of current and former executives of Quiznos throughout the United States.  In addition, there were numerous depositions of third parties not employed by either plaintiffs or defendants.  All told, in all four of the cases there were a total of 80 depositions taken and defended by Class Counsel.  In addition, there was extensive motion practice concerning discovery, including motions to compel discovery and motions for protective orders involving not only defendants, but third parties who had been served with subpoenas duces tecum who contested those subpoenas.  In this regard, Class Counsel served 67 third party subpoenas in an effort to obtain the records necessary to pursue the claims.

## MEDIATION AND SETTLEMENT

Counsel for the parties initially met in Chicago, Illinois in April 2008 to discuss the possibility of using mediation to achieve settlement.  After negotiations to establish terms, they chose the Honorable Dickran M. Tevrizian, Jr., a retired federal judge from Los Angeles, California, as mediator.  Counsel for both sides, certain designees of the representative plaintiffs

as well as key Quiznos personnel met with Judge Tevrizian for three days—August 11 through August 13, 2008—at Judge Tevrizian's offices in Los Angeles, and then held another session, this time with counsel only present, in Los Angeles on August 28, 2008. Although these sessions did not result in resolution, the discussions at the mediation helped lay the groundwork for future negotiations that proved to be more fruitful nearly a year later.

In June 2009, after Judge Arguello's ruling denying class certification and enforcing the class action bar in Quiznos standard-form franchise agreement, counsel for the parties made another effort to resolve the cases. (Kravit Decl. ¶¶ 2-4.) This time they turned to Attorney Michael L. O'Donnell of the Denver, Colorado firm Wheeler Trigg O'Donnell LLP. Counsel met with Mr. O'Donnell in person in Denver for all-day sessions on July 2, 2009 and August 7, 2009, and continued negotiations thereafter, often with the involvement of Mr. O'Donnell, until the Settlement Agreement was finalized on October 27, 2009. (Kravit Decl. ¶¶ 2-8.)

The Settlement Agreement is the product of hard-fought litigation conducted in at least four different courts throughout the United States, and of intense arm's length negotiations that took nearly fifteen months from start to finish. On September 17, 2009, after obtaining leave from this Court, Class Counsel filed the Second Amended Complaint [Dkt. 145] as the first step toward approval of the settlement, bringing the claims of the representative plaintiffs in the SNO Class Action, the *Westerfield Action*, and the *Brunet Action* into this lawsuit. On November 20, 2009, this Court granted preliminary approval of the settlement, approved the form of notice to the class, and appointed KHK and M&K as Class Counsel [Dkt. 152].

In the wake of this Court's decision granting preliminary approval of the settlement, the notice and claims process took place in late 2009 and the first few months of 2010. The third party administrator approved by the Court, Garden City Group, Inc. ("GCG"), sent out 8,468

claim packets to members of the settlement class and 2,254 class members submitted claim forms. Pursuant to the process approved by the Court in November 2009, all disputes over claim disposition have been resolved to the satisfaction of Quiznos and Class Counsel. (Klein Decl. ¶ 22.).

The settlement was met with overwhelming approval by the Class Members. Only one objection was filed, and the objector's motion to intervene remains pending as of today. 239 Class Members opted out. Thus, 97.2% of the class has either actively or passively accepted the benefits of the settlement; even those Class Members who did not submit claims benefit from releases (for each franchise agreement they signed) worth an average of approximately $144,148.[3] (Schaeffer Report, pgs. 29-31, Confidential Schaeffer Decl. ¶ 2 and Exh. A.)

## SUMMARY OF SETTLEMENT TERMS

### A.    The SNO Class Action.

The Settlement Agreement defines the SNO Settlement Class as follows:

**"SNO Settlement Class"** for the purposes of this Agreement refers to all Quiznos Franchisees who paid an Initial Franchise Fee or who were not charged an Initial Franchise Fee on or before July 2, 2009 to purchase a Quiznos Restaurant to be located in the United States, the District of Columbia or the United States Territory of Puerto Rico which did not open for operation on or before that date. The SNO Settlement Class also specifically includes (i) Barton Klatt; (ii) Megan Makki; (iii) Joe Chia; (iv) Moe Mastani; (v) Amir Milani; (vi) Negin Milani; and (vii) Sima Savarini (together with their owners, guarantors, officers, directors, predecessors, successors, representatives, heirs, executors, administrators, successors and assigns). Except as otherwise provided in this paragraph, the SNO Settlement Class specifically **EXCLUDES**:

---

[3] While the administrator sent 8,468 packets, the settlement encompasses approximately 11,816 franchise agreements. This is because certain franchisees own more than one unit.

(a)     The *Elhilu* Settlement Class;

(b)     All Quiznos Franchisees who would otherwise be SNO Class Members but who have previously asserted a claim against QCE, the QCE-Related Parties or QCE's Affiliates (or any of their predecessors, successors, or parents) and were represented by counsel which resulted in a signed settlement agreement, judgment or arbitration award;

(c)     All Quiznos Franchisees who timely and validly request exclusion from the SNO Settlement Class pursuant to the opt out provisions described in paragraph 12.2 of this Agreement;

(d)     All Quiznos Franchisees who purchased a Non-Traditional Quiznos Restaurant;

(e)     All Persons who are employees of QCE, the QCE-Related Parties, and the Defendants (but not excluding area directors, market captains or regional managers of QFA, QCE, and/or one of the QCE-Related Parties who otherwise are members of the SNO Settlement Class and/or the Franchise Operator Settlement Class);

(f)     All Quiznos Franchisees not represented by counsel against whom a default judgment was entered in favor of any of the Defendants named in the SNO Operator Class Action; and

(g)     All Quiznos Franchisees who received a full refund of the Initial Franchise Fee paid for a Quiznos Restaurant to be located in the United States, the District of Columbia and the United States Territory of Puerto Rico which did not open for operation on or before July 2, 2009.  In establishing the

identity of the members of the SNO Settlement Class, the Parties shall primarily rely on the records of QCE.

SNO Class Members had the option of choosing to remain in the Quiznos System and opening their restaurants. These Class Members received a Go Forward Package Credit Certificate ("GFP Credit Certificate") in an amount equal to the initial franchise fee paid by the SNO Class Member. Typically, this fee was $25,000, with $20,000 for each additional franchise purchased, although some SNO Class Members paid less. The GFP Credit Certificate is not assignable and can be used only toward the purchase of equipment and supplies needed to open and run a Quiznos restaurant. It cannot be used to pay royalties.[4]

SNO Class Members who wish to rescind their franchise agreements and exit the Quiznos System fell into one of the following five groups:

(a)     SNO Class I Members have franchise agreements effective dates between February 17, 2006 and July 2, 2009 (inclusive). SNO Class I Members will receive a rebate of 10% of the initial franchise fee they paid for each franchise agreement being rescinded.

(b)     SNO Class II Members have franchise agreements with effective dates between February 17, 2003 and February 16, 2006 (inclusive). SNO Class II Members will receive a rebate of 32.7% of the initial franchise fee they paid for each franchise agreement being rescinded.

(c)     SNO Class III Members have franchise agreements with effective dates before February 17, 2003. SNO Class III

---

[4] In addition, SNO Class IV Members (as defined below) cannot elect the GFP Credit Certificate option.

Members will receive a rebate of 5% of the initial franchise fee they paid for reach franchise fee they paid for each franchise agreement being rescinded.

(d)     SNO Class IV(a) Members are those who signed any release in favor of any of the Quiznos Released Parties (as defined in the Settlement Agreement) and who did not receive any economic or other consideration for the release. They will receive $500.00.

(e)     SNO Class IV(b) Members are those who signed any release in favor of any of the Quiznos Released Parties and who received economic or other consideration for the release (not including a release of Quiznos' claims for lost future royalties). They will receive $250.00.

Participating SNO Class Members from all four classes release Quiznos from any and all claims which are or could be based on the sale and purchase of franchise agreement, disclosures, earnings claims, the franchise sales process, site selection, site approval, site location, opening support and assistance, marketing, advertising, use of marketing and promotion fees, food, equipment and supplier pricing, sourcing and approval, including the disclosure of same, termination, and the ownership, and operation of a Quiznos restaurant.

Under the settlement, the Quiznos Released Parties release SNO Class Members from the counterclaims asserted in the SNO Class Action and all claims that were or could be based on a franchise agreement for a Quiznos restaurant that never opened or commenced operations and/or the sale or purchase of such a franchise agreement. These releases extend only to the claims that

were or could have been asserted by the parties based on the facts asserted in both sides' pleadings as of the date of settlement.

In recognition of the substantial time and effort expended by the SNO Representative Plaintiffs in pursuing claims on behalf of the SNO Class Members, the Settlement Agreement also calls for the payment of incentive awards of $12,500 for each franchise agreement signed by a SNO Representative Plaintiff. Since the 16 SNO Representative Plaintiffs own 13 franchise agreements between them, this provision of the settlement will result in a total of $162,500 in incentive payments to the SNO Representative Plaintiffs. As a condition of receiving the incentive payments, the SNO Representative Plaintiffs cannot opt out of the SNO Settlement Class. These incentive payments do not diminish any benefits provided to the members of the SNO and Franchise Operator Settlement Classes. These incentive payments will be paid by Quiznos.

**B.     The Franchise Operator Class Action.**

The Settlement Agreement adopts the following definition of the Franchise Operator Settlement Class, which the Court adopted in its order for preliminary approval:

**"Franchise Operator Settlement Class"** for purposes of this Agreement means all Quiznos Franchisees (including all Current Operators as defined in paragraph 2.11) in the United States, the District of Columbia and the United States Territory of Puerto Rico who, at any time prior to the Preliminary Approval Date, have operated a Quiznos Restaurant pursuant to a Franchise Agreement. The Franchise Operator Settlement Class specifically **EXCLUDES**:

(a)     All Quiznos Franchisees who would otherwise be Franchise Operator Settlement Class Members but who have previously asserted a claim against QCE, the QCE-Related Parties or QCE's Affiliates (or any of their

predecessors, successors, or parents) and were represented by counsel which resulted in a signed settlement agreement, judgment or arbitration award;

(b)     All Quiznos Franchisees who timely and validly request exclusion from the Franchise Operator Settlement Class pursuant to the opt out provisions described in paragraph 12.2 of this Agreement;

(c)     All Quiznos Franchisees who operated a Non-Traditional Quiznos Restaurant (defined in paragraph 2.35), except non-institutional owners (i.e. Quiznos Franchisees who have executed 2 or fewer Franchise Agreements) of Non-Traditional Quiznos Restaurants located in convenience stores and gas stations;

(d)     All Persons who are employees of QCE, the QCE-Related Parties, and the Defendants (but not excluding area directors, market captains or regional managers of QFA, QCE and/or one of the QCE-Related Parties who otherwise are members of the SNO Settlement Class and/or the Franchise Operator Settlement Class); and

(e)     All Quiznos Franchisees not represented by counsel against whom a default judgment was entered in favor of any of the Defendants named in the Franchise Operator Class Action Litigation. In establishing the identity of the members of the Franchise Operator Settlement Class, the Parties shall primarily rely on the records of QCE.

The Settlement Agreement divides Franchise Operator Class Members into three groups: Class I Members are those who are still operating one or more Quiznos

restaurants as of the Preliminary Approval Date (November 20, 2009). Class II Members are those who have sold or transferred their restaurant(s) to other franchisees and ceased operations (these transfers required the franchisees to execute releases). Class III Members are those who ceased operating their restaurants on or before the Preliminary Approval Date.

    i.    Franchise Operator Class I Members receive $3,150.00, made in the form of credits applied to food purchases in twelve equal quarterly installments over a period of three years. Quiznos has the right to offset compensation to Franchise Operator Class I Members with past due royalties, marketing and promotion fees and other amounts owed by the Franchise Operator Class I Member which accrued on or after May 1, 2009. A Franchise Operator Class I Member who exits the Quiznos System within three years of the Funding Date immediately forfeits the right to any unapplied credits.

    ii.    Franchise Operator Class II Members receive $475.00 by check promptly after the Court's Judgment is deemed Final pursuant to the Settlement Agreement.[5]

    iii.    Franchise Operator Class III Members receive $1,700.00 by check promptly after the Court's Judgment is deemed Final pursuant to the Settlement Agreement.

In recognition of the substantial time and effort expended by the Franchise Operator Representative Plaintiffs in pursuing claims on behalf of the Franchise Operator Class Members,

---

[5] These and all payments called for by the Settlement Agreement, as well as all system-wide changes to the Quiznos System, will be made shortly after final approval assuming there is no appeal from the final judgment. The Settlement Agreement defines "Final" in paragraph 2.18. It defines the "Funding Date" in paragraph 2.27.

the Settlement Agreement also calls for the payment of incentive awards of $50,000 for each Franchise Operator Representative Plaintiff. These awards to the 45 Franchise Operator Representative Plaintiffs will result in a total of $2,250,000 in incentive payments to the Franchise Operator Representative Plaintiffs. As a condition of receiving the incentive payments, the Franchise Operator Representative Plaintiffs cannot opt out of the Franchise Operator Settlement Class. These incentive payments will be made by Quiznos and do not diminish any benefits provided to the members of the SNO and Franchise Operator Settlement Classes.

###### C.     Business Changes.

SNO Class Members and Current Operators with open restaurants who continue in the Quiznos System after the settlement is Final will obtain significant benefits from additional aspects of the Settlement Agreement. Specifically, in the Settlement Agreement Quiznos agrees to make modifications to its franchise model and business practices that are intended to enhance the profitability of each Quiznos Restaurant, strengthen the franchisor-franchisee relationship, and enhance franchisee prospects for success in developing a Quiznos Site and opening a Quiznos Restaurant. The business changes result from concerns of the franchisees as articulated in the litigation.

These enhancements and modifications include:

> (1) Creation of an "Advertising Advisory Council" made up of franchisee representatives drawn from across the country who will provide input about franchisee desires and needs concerning Quiznos advertising and marketing initiatives;

(2) Modifications to Quiznos' "Franchise Disclosure Document" that provide specific facts about how Quiznos distributes food and other restaurant products or supplies to Quiznos Franchisees;

(3) Annually hiring an independent agency to audit costs of food, paper and supplies being sold to Quiznos Franchisees and to share the results of that audit with Quiznos Franchisees;

(4) Creation of a Quiznos-recognized independent franchisee association, the Independent Association of Franchisees ("IAOF"), that will maintain its own corporate status as a not-for-profit entity with the costs of incorporation, other startup costs, and a certain portion of annual operational costs initially to be paid for by Quiznos and whose purpose will be to advocate franchisee issues and concerns;

(5) Creation of a "Dispute Resolution Program," the purpose of which will be to address and resolve day-to-day operational concerns of Quiznos Franchisees;

(6) Creation of a "Store Transfer Assistance Program" that will help franchisees seeking to sell their stores locate potential buyers, including existing franchisees who wish to buy additional stores;

(7) Development of new alternative supplier request protocols to create a formal process for alternative supplier approval;

(8) If Quiznos Franchisees are obligated to create a delivery program in their stores, provisioning of the programmatic materials (including the "Delivery Kit") at a reduced cost;

(9) Good faith consideration of all written waivers requested by Quiznos Franchisees in the "Dispute Resolution Program" with respect to any policies or procedures that mandate the maximum retail price that they may charge consumers;

(10) Establishment of a "Retraining Program" available to any Quiznos Franchisee currently operating a restaurant so as to ensure that the franchisee understands all operational guidelines and procedures;

(11) The creation, update and/or maintenance of Quiznos internal monitoring systems of the SNO Pipeline; and

(12) An agreement to provide each SNO Class Member who invokes the Election to Proceed as Franchisee with the specific name and contact information of an employee or agent of Quiznos who has responsibilities for site development, including finding Quiznos sites for Quiznos Franchisees and related assistance.

In addition, as part of the Settlement Agreement, Quiznos will contribute to the National Marketing Fund Trust and the Regional Advertising Program Trust an additional $19,400,000 which it is otherwise not obligated to pay. Of this amount, $10,000,000 will be dedicated to local advertising (as specifically defined in paragraph 4.5 of the Settlement Agreement) between January 1, 2010 and December 31, 2012, with the balance to be applied to advertising initiatives

determined by Quiznos for the period 2009-2012. The use of these funds will be governed by Quiznos with input from the "Advertising Advisory Council" created by the settlement.

Quiznos has also agreed to forgive debts (mostly arising from past due royalties and other payments) owed by Franchise Operator Class I Members, Franchise Operator Class II Members and Franchise Operator Class III Members (who do not opt out of the Franchise Operator Settlement Class). In addition, Quiznos has agreed to release and otherwise forego prosecuting claims for future lost royalties against SNO Settlement Class Members (who do not submit an Election to Proceed as Franchisee) as well as Franchise Operator Class II Members and Franchise Operator Class III Members who do not opt out of the SNO Settlement Class or the Franchise Operator Settlement Class.

### D. Additional Provisions.

The Settlement Agreement provides for a third category of incentive payments to persons identified on Exhibit L to the Settlement Agreement. These individuals, who contributed funds to assist Class Counsel's prosecution of the actions as part of the Litigation Action Program (the "LAP") instituted by the Toasted Subs Franchisee Association, Inc. ("TSFA"), also made themselves available to provide factual and strategic support as the lawsuits progressed. Those contributions had a direct and very real impact on the litigation, resulting in the payment of $401,686.83 in litigation expenses by the LAP. (Goode Decl. ¶ 23; Klein Decl. ¶ 19 and Exh. J; Zazzaretti Decl. ¶ 2 and Exh. A.) These incentive awards are payable by Quiznos and total a maximum of $500,000.[6] Like the incentive awards payable to the representative plaintiffs, payment of the Exhibit L incentive awards will not diminish any of the benefits provided to the SNO Class Members and the Franchise Operator Class Members.

---

[6] Based on paragraph 10.4 of the Settlement Agreement, Quiznos has agreed to this payment to ensure repayment to the LAP Members with a slight return on the money they paid, to be distributed on a pro rata basis.

Attorneys fees and costs will be paid by Quiznos directly, without reducing or diminishing the funds and other benefits to be received by the SNO Class Members and Franchise Operator Class Members. Class Counsel is seeking a fee award of **$10,000,000** and reimbursement of costs and expenses of **$810,425.27**, well within the agreed-upon cap of attorneys fees and costs of $10,000,000 and $1,000,000, respectfully. Quiznos, for its part, does not object to or oppose the $10,000,000 fee request and an award of costs up to $1,000,000, and it will pay such amounts as the Court awards. Neither Class Counsel nor Quiznos shall appeal this Court's decision on fees.[7] The Settlement Agreement further provides that the Court should consider the Fee Application separately from the fairness, reasonableness and adequacy of the settlement.

## ECONOMIC VALUE OF THE SETTLEMENT

Class Counsel engaged Bruce S. Schaeffer, pursuant to paragraph 4.7(b) of the Settlement Agreement, as an expert to provide a valuation of the various provisions of the settlement. Mr. Schaeffer is a lawyer in private practice in New York City and the principal owner of Franchise Valuations, Ltd., a firm that provides valuations and appraisals primarily in the franchise field. His credentials are unquestionable and he is widely regarded in the franchise industry. His *curriculum vitae* is submitted along with his report.

Mr. Schaeffer's formal report is attached to his declaration, and we urge the Court to review the report in detail. We will not repeat all of the conclusions of the report, but summarize its major points:

- The settlement has a total estimated value of $206,317,158.

---

[7] There is one exception: Quiznos may appeal a decision awarding attorneys fees in excess of $10,000,000, and in that event Class Counsel may defend against Quiznos' appeal of such an award.

- Changes to Quiznos' FDD will make litigation less likely, resulting in benefits to franchisees and to Quiznos of $18,684,592.

- The independent pricing audit is estimated to provide cost savings to franchisees worth $34,000,000 over time.
- The retraining program will make franchisees more profitable and efficient and thus will increase royalties received by Quiznos, for aggregate benefits to Quiznos and to franchisees of $30,898,675.

- The forgiveness of existing franchisee debt plus the waiver of future lost royalty claims total $72,276,821 in benefits.

Mr. Schaeffer deemed his valuation to be conservative, and even a glance shows this to be true. It is widely recognized that an independent franchisee association is one of the most potent sources of power for franchisees in their ongoing discussions and negotiations with franchisors. But because Mr. Schaeffer viewed most of the benefits of such an association as unquantifiable, he assigned a specific value of only $175,000 to the association. There were numerous other elements of the settlement that Mr. Schaeffer viewed as providing intangible benefits that were not readily quantifiable, such as the Advertising Advisory Council, the Dispute Resolution Program, and the protocols for requesting permission to use alternative suppliers, and he accordingly calculated a total benefit from those provisions (and the other intangibles) of only $8,500,000, even though it is reasonable to anticipate that these changes will yield substantially greater improvements in the Quiznos System as they are implemented.

Finally, we note that Quiznos will be filing evidentiary support in greater detail of the participation by the members of the various settlement classes. We do not expand upon that here.

## ARGUMENT

## I.    THIS COURT SHOULD CERTIFY THE SETTLEMENT CLASSES.

### A.    The Proposed Settlement Classes Meet The Requirements of Rule 23(a).

#### 1.    Numerosity.

Excluding the California franchisees covered by the settlement of the *Elhilu Action*, the SNO Settlement Class has approximately 2,300 members. In early 2009, when the plaintiffs in the *Brunet Action* filed their motion for class certification, they estimated that there were then 4,636 Quiznos franchisees currently operating restaurants. Class Counsel has estimated that there are several thousand franchisees who have closed their stores. The administrator sent 8,468 claim form packets to franchisees and former franchisees. It is clearly impracticable to join all of these class members in a single lawsuit.

#### 2.    Commonality.

This requirement "is readily met in most cases." *In re Mex. Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1012 (N.D. Ill. 2000), *aff'd,* 267 F.3d 743 (7th Cir. 2001). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Lavaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Here, there are numerous common issues of both law and fact that unite the SNO Settlement Class. All signed Quiznos franchise agreements with substantially identical provisions, which provisions give rise to both claims and defenses. All SNO Class Members' claims deal with whether Quiznos has the right to retain the initial franchise fee when a restaurant does not open. Franchises were marketed and sold through national advertising campaigns that were uniform throughout the country. In addition to its contract-based defenses, which as noted above rest on uniform contractual language, Quiznos has also asserted other defenses common to the SNO Settlement Class, such

23

as the inapplicability of the Colorado Consumer Protection Act, and the applicability of the statute of limitations.

Likewise, the Franchise Operator Settlement Class contains common issues of both law and fact, again stemming initially from the virtually identical language of the franchise agreements signed by class members. The accuracy of the disclosures concerning, among other things how Quiznos makes money selling food and supplies to franchisees, made in Quiznos' Uniform Franchise Offering Circular ("UFOC") and its FDD is a common issue, as is the legal effect of disclaimers contained in the UFOC, the FDD, and the standard-form franchise agreement. All of the RICO claims raised in the Franchise Operator Class Action Litigation raise common legal issues, including whether the Quiznos System as a whole can serve as an "enterprise" and whether the wire transfers through which Quiznos obtained payments from franchisees qualify as predicate acts that form the requisite "pattern of racketeering." Similarly, the allegations of misuse of advertising and marketing trust funds are identical as to every franchisee and are therefore common questions of law and fact.

### 3. Typicality.

"Class members claims need not be identical, as long as they are substantially similar." *Mex. Money Transfer*, 1624 F. Supp. at 1014. Typicality is satisfied if the representative plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).

The SNO Class Action alleges that Quiznos undertook a plan to create a "pipeline" of franchise owners who would not be able to find sites but would subsequently be available to take over stores that failed and executed that plan through a centrally-controlled marketing strategy.

This uniform course of conduct, the SNO Representative Plaintiffs claim, violated the Colorado Consumer Protection Act, breached the franchise agreements' obligation to provide site selection assistance, and constitutes a fraud in the inducement. The central practice of Quiznos being challenged is the same across the entire SNO Settlement Class, and all members of the class assert the same legal theories.

The claims of the Franchise Operator Representative Plaintiffs are likewise typical of those of the class they represent. Plaintiffs in the Franchise Operator Class Action Litigation allege that Quiznos followed a nationally-uniform practice of extracting unlawfully-concealed revenues through the process of selling food and supplies to its franchisees, and in so doing committed common law fraud, violated the RICO statute, and breached the terms of the franchise agreement. Plaintiffs assert that anyone who operated a Quiznos franchise was subjected to these practices and suffered damages from them. Similarly, Quiznos asserts defenses based on uniform contractual disclaimers and disclosures made in UFOCs and FDDs that are identical for both the representative plaintiffs and the class member franchisees the plaintiffs seek to represent.

### 4.    Adequacy.

"The purpose for examining the adequacy of class representation is to expose incompetent or ineffective class counsel and uncover any potential conflicts of interest between the class representatives and the remaining class members." *Mex. Money Transfer*, 164 F. Supp. 2d at 1013. "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario*, 963 F.2d at 1018.

To begin with, Class Counsel have competently and effectively pressed factually and legally complex claims in four United States District Courts for more than four years. Justin M.

Klein, of Marks & Klein LLP, has represented numerous franchisees and franchisors in both litigation and counseling roles. (11/18/09 Leitner Decl. ¶¶ 9-14 [Dkt. 151]; Klein Decl. ¶¶ 2, 14, 17-18 and Exh. I.) Mr. Klein has also served as plaintiffs' counsel in franchise class actions that were resolved successfully. (*Id*.) Joseph S. Goode and Mark M. Leitner of Kravit Hovel & Krawczyk, S.C. have extensive trial and litigation experience in complex commercial cases, specifically in dealership and franchise-related matters. (11/18/09 Leitner Decl. ¶¶ 2-8 [Dkt. 151].) Any questions about the adequacy of Class Counsel are put to rest by the history of vigorous and aggressive litigation in the four cases that have been brought before this Court for settlement. (11/18/09 Leitner Decl. ¶¶ 19-28 [Dkt. 151].)

Neither is there any doubt that the class representatives in both the SNO Class Action and the Franchise Operator Class Action Litigation are adequate representatives of the class membership at large. (11/18/09 Leitner Decl. ¶¶ 15-28 [Dkt. 151].) The named plaintiffs in each case worked hard in discovery and participated in strategy and case planning decisions to promote the best possible result for the classes as a whole. (*Id*.) A number of them even advanced personal funds for travel expenses to attend depositions in an effort to lower the overall costs of the litigation (for all parties) and to attend certain mediation events. (Goode Decl. ¶ 27 and Exh. L.)

And there can be no suggestion that there might be antagonistic or conflicting claims that divide the representative plaintiffs from the class members. To the contrary, the SNO Representative Plaintiffs and the SNO Class Members share common interests in establishing Quiznos' liability and obtaining refunds of their franchise fees. Thus, there is no antagonism created by differing forms of relief. Some SNO Class Members may wish to remain in the

Quiznos System and receive the GFP Credit Certificates, but that choice will not diminish the settlement payments available to SNO Class Members who elect to leave the Quiznos System.

Similarly, there exist no possible scenarios in which "antagonistic or conflicting claims" could divide the Franchise Operator Representative Plaintiffs from the class members they seek to represent. The fact that some Franchise Operator Class Members have gone out of business while others have remained open does not change this fact. There are no actions by Quiznos that helped franchisees who kept operating at the expense of franchisees who went out of business. There are only different degrees of a common harm allegedly suffered by class members, and this does not give rise to antagonism or conflict that undermines adequacy.

In this regard, the sole objector contends that the Franchise Operator Settlement Class fails to recognize the substantial distinction between Class III members who went out of business owing Quiznos money that those who, like the Gevaarts, had no outstanding obligations at that time. However, our response to this baseless distinction is set out fully in our brief filed March 1, 2010 [Dkt. 159], and we do not repeat it here. It is enough to state that in **both** of their briefs, the Gevaarts fail to acknowledge, let alone discuss, the tens of millions of dollars in value provided to class members (like the Gevaarts themselves) who no longer face claims for lost future royalties. Moreover, the Gevaarts' contention that the representative plaintiffs and Class Counsel did not obtain enough value for those similarly situated fails as a matter of law because the Gevaarts made no effort to show the plaintiffs' likelihood of success at trial.

Finally, the interests of class members in both the SNO Class Action and the Franchise Operator Class Action Litigation who want no part of the dispute or the settlement, or who wish to pursue different strategies for litigation against Quiznos, were fully protected by the opt out mechanism provided for in the Settlement Agreement. 239 franchisees chose to do so; every

Class Member was given the choice. The opportunity to opt out provided franchisees and former franchisees freedom to pursue whatever course of action they preferred. This, of course, includes the Gevaarts; if the settlement provided them with inadequate value, they should have opted out and sought to obtain the full value of their claim in a solo lawsuit.

**B.      Common Questions Predominate and a Class Action is the Superior Method Of Resolving the Claims.**

In a franchise context, where all franchisees sign nearly-identical agreements, predominance of common questions is readily found because proof "of liability will be the same for every class member." *Bird Hotel Corp. v. Super 8 Motels, Inc.*, 246 F.R.D. 603, 607-08 (D.S.D. 2007); *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (affirming certification of gasoline-dealer class where system used dealer agreements that were "materially similar"). Because both the SNO Class Members and the Franchise Operator Class Members signed essentially identical franchise agreements after receiving identical UFOCs or FDDs, the centrality of these common documents to both side of the case—plaintiffs' claims and Quiznos' defenses alike—weighs heavily in favor of certification under Fed. R. Civ. P. 23.

Similarly, the SNO Representative Plaintiffs and the Franchise Operator Representative Plaintiffs alike allege that they were induced to buy franchises through a uniform, scripted sales process that was dictated by Quiznos' corporate headquarters, and that this practice was fraudulent and violated RICO. Quiznos, of course, disputes this contention, but the very point here is that the presence of claims based on a "standardized sales pitch," *In re First Alliance Mortgage Co.*, 471, F.3d 977, 991 (9th Cir. 2006), supports a finding of predominant common issues that warrant certification.

Some of the claims in the Franchise Operator Class Action Litigation involve literally ***no*** individualized proof. For example, the claim based on misuse of the advertising and marketing

fund is based on the language of the franchise agreement, Quiznos' status as trustee of funds paid under that agreement, and Quiznos' unilateral action in spending funds for purposes inconsistent with a trustee's fiduciary obligation.  Common issues necessarily predominate where there are no individual issues to outweigh them.

The class action settlement presented on this motion "is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The only alternative is individual suits for both liability and damages.  These would be far too expensive for most franchisees to prosecute.  At least in the SNO context, the maximum potential damages of $25,000 tilt even further against the realistic viability of individual damages claims.

Likewise, there has not been a groundswell of individual suits against Quiznos, *see* Fed. R. Civ. P. 23(b)(3)(B), evidencing a significant interest of class members in controlling the prosecution of their own suits.  There are only 239 opt-outs.  Some of those opt-outs may file individual actions; most, we suspect, will not.  There is no wave of independent litigation against Quiznos.

Finally, there are no practical issues that would impair the manageability of administering the class settlement process in this Court.  *See* Fed. R. Civ. P. 23(b)(3)(D).  Indeed, now that this Court has preliminarily approved the settlement, and the reaction of the Class was positive, the most sensible approach is that this Court to approve the Settlement, rather than using the time and resources of four different courts across the nation to administer the approval process separately in each case.

## II.     THIS COURT SHOULD ENTER JUDGMENT APPROVING THE SETTLEMENT.

This Court has succinctly summarized the principles that govern judicial evaluation of class action settlements:

> Courts favor the resolution of a class action by way of settlement and will approve such a settlement if it is fair, reasonable and adequate when viewed in its entirety . . . . In evaluating a proposed settlement, the court recognizes that the "essence of settlement is compromise" and will not represent a total win for either side . . . . Accordingly, the court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial.

*Mex. Money Transfer*, 164 F. Supp. 2d at 1014 (citations omitted).

The Seventh Circuit has established six factors that district courts must evaluate and balance in deciding whether to approve a class action settlement:

(1)     The strength of plaintiffs' case, weighed against the settlement offer;

(2)     The complexity, length and expense of further litigation;

(3)     The presence of collusion between the parties;

(4)     The opinion of competent counsel;

(5)     The reaction of class members to the proposal; and

(6)     The stage of proceedings and discovery completed.

*See Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 308 (7th Cir. 1985).  This section of our brief applies those guidelines and demonstrates why the settlement should be approved.

### A.     The Strength of Plaintiffs' Case, Weighed Against The Settlement Offer.

Even though the cases have been in suit since 2006, there were only three judicial decisions addressing the legal merits of the claims on motions to dismiss.  The results of those

decisions were mixed. In the *Bonanno Action*, the court denied Quiznos' motion to dismiss the entire case across the board. In the *Westerfield Action* the court initially granted a motion to dismiss the fraud-based claims based on the disclaimers and disclosures in the Quiznos' UFOC and the franchise agreement, but later reversed itself and granted plaintiffs' motion for reconsideration pursuant to Fed. R. Civ. P. 59(e), reinstating the claims.

For its part, this Court granted Quiznos' motion to dismiss for failure to state a claim, but did so in part based on the reasoning expressed in the initial decision from the *Westerfield Action*, subsequently vacated when reconsideration was granted. And in the *Brunet Action*, Quiznos' motion to dismiss was fully briefed but never decided.

Further complicating the picture is the fact that the initial round of Fed. R. Civ. P. 12(b)(6) decisions in the Franchise Operator Class Action Litigation all involved plaintiffs' original complaints. Based on the dozens of depositions taken and the millions of documents reviewed, the Franchise Operator Representative Plaintiffs refined and expanded their claims to include new legal theories of recovery and substantial additional factual detail that was included in Amended Complaints filed in all three of those suits. Quiznos challenged the legal sufficiency of these Amended Complaints on motions to dismiss in all three cases, all of which were fully briefed but not resolved when the parties executed the Settlement Agreement. Had plaintiffs' claims survived these legal challenges, it is certain that Quiznos would have renewed its effort to defend against the Franchise Operator Class Action Litigation by bringing motions for summary judgment, contending that the factual record did not support the legal theories of liability and that plaintiffs could not prove their damages claims. That is, at any rate, what Quiznos did after the close of discovery in the *Bonanno Action*; that summary judgment motion was briefed but remained pending at the time of settlement.

To be sure, the classes' claims had substantial value had they prevailed at trial. Plaintiffs had a preliminary analysis from a consulting damages expert showing at least $700 million in damages based on a theory requiring disgorgement of ill-gotten gains in the Franchise Operator Class Action Litigation. (Goode Decl., ¶ 30.) Likewise, the total value of franchise fees that could have been recouped for all SNOs nationwide was between $55 million and $65 million. (Goode Decl. ¶ 30.) The significant problem with these damages analyses, however, is that they assume the plaintiffs in the SNO Class Action and the Franchise Operator Class Action Litigation would have been allowed to proceed on a class basis, and that assumption can now be deemed, at best, dubious. `

Make no mistake: Class Counsel believed and continue to believe that the arguments in favor of class certification were strong. But Quiznos believed and continues to believe that the contrary arguments are even stronger, in particular the argument that a class action is prohibited by Section 21.4 of its standard-form franchise agreement. And Quiznos' position has carried the day in court. On April 20, 2009 the district court in the *Bonanno Action* issued a 53-page decision enforcing the class action bar and denying plaintiffs' motion for class certification. On June 29, 2009, the Court of Appeals for the Tenth Circuit denied plaintiffs' request for leave to immediately appeal the district court's decision. The practical effect of these rulings was that, absent a class-based settlement agreement, the *Bonanno Action* was not a class action with tens of millions of dollars at stake but simply a suit asserting the claims of 10 franchisees to recover their $25,000 franchise fees.

None of the cases comprising the Franchise Operator Class Action Litigation ever reached a judicial decision on the merits of Quiznos' class action bar. But it is eminently fair to conclude that the path to class certification in the those cases led up an even steeper hill than the

one faced by the unsuccessful plaintiffs in the *Bonanno Action*. One of the principal arguments against the enforcement of that bar in the *Bonanno Action* was that the $25,000 at stake for each plaintiff was not enough to warrant bringing individual suits, and that the SNO plaintiffs' claims therefore had to be aggregated if they were to be viable at all. The district court rejected this argument, ruling that the $25,000 was sufficient incentive to litigate, particularly in light of statutes that offered double or treble damages plus attorney fees if plaintiffs succeeded. *Bonanno, et al. v. The Quizno's Franchise Company LLC, et al.*, Decision and Order dated April 20, 2009 at pgs. 44-47 [Dkt. 331].

If this Court and the other district courts in the Franchise Operator Class Action Litigation had found this reasoning persuasive (considering that all franchise agreements dictate Colorado law be applied), they would have stopped all class certification motions dead in their tracks. The Franchise Operator Representative Plaintiffs who had managed to stay in business each claimed several hundred thousand dollars in losses from overpricing. And those Class Members who had been driven out of operation altogether lost their entire investments, sometimes reaching seven figures. If Judge Arguello was right and $25,000 stakes sufficed to incentivize litigants and lawyers, stakes many times greater would *a fortiori* lead to the same result.

Even if the courts supervising the Franchise Operator Class Action Litigation disagreed and struck down the class action bar, there remained significant obstacles to certification. For example, Quiznos certainly would have argued that, especially when each class member claimed hundreds of thousands of dollars in damages, issues of linking the claimed damages to the actions alleged to create Quiznos' liability and establishing the amount of damages in the first instance would have overwhelmed common legal and factual questions relating to liability and

defenses against it, to satisfy the "predominance" requirement of Rule 23(b)(3). Plaintiffs would, of course, have responded that the best approach in such a situation is to conduct class-based proceedings on the common issues of liability and defense, and have individual damages hearings. *See e.g.*, *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 675 (N.D. Ill. 1989). The point is that the strength of plaintiffs' claims **as a class action** is subject to significant uncertainty that affects their value in the context of a settlement analysis.[8]

On the other side of the coin, there is no question that the settlement offers franchisees and former franchisees substantial value. One legal commentator summarized this point in an April 2010 article:

> Last November, when an Illinois federal court preliminarily approved a $100 million settlement resolving four class action lawsuits filed by certain Quiznos franchisees against the Quiznos organization, the franchisees involved, as well as all existing and potential Quiznos franchisees, reaped the financial benefits of the settlement and the benefits of an agreement by Quiznos to be more transparent with respect to its supply chain. Specifically, Quiznos agreed to submit to an annual review of its supply and food prices by a third-party auditor and to revise its Franchise Document (FDD) to clarify the supply chain disclosure and the involvement of Quiznos-owned entities.[9]

(Jillian M. Suwanski, "Quiznos Settlement Sparks Franchisee Focus on Supply Chain Issues," *Lexology*, April 14, 2010, Goode Decl. Exh. M.) This article, by an objective observer, recognizes the significance of this settlement for franchisees and the Quiznos System as a whole.

This settlement accomplishes several significant objectives: first, it provides the right to obtain monetary compensation to every person who has owned a Quiznos franchise in the past

---

[8] Again, notable in this context is the fact that any individual plaintiff who believed the settlement provided inadequate monetary compensation was free to opt out and pursue an individual suit to recover his or her own claimed damages. 239 franchisees understood as much and took the appropriate action to preserve their rights.

[9] Attorney Suwanski is neither affiliated with Class Counsel nor, so far as we know, with the defense firms or Quiznos.

(whether or not that franchise ever opened for business) or continues to operate one today. Second, former franchisees are released from significant potential claims that Quiznos had the right to assert against them. Third, the settlement creates significant business changes likely to benefit franchisees on a going-forward basis, including the creation of an independent but Quiznos-recognized franchise association, which has never existed in the Quiznos System before.

Some SNO Class Members elected to receive the GFP Credit Certificate and thus received value equivalent to the amount of their original franchise fee. (These SNO Class Members also benefit from the business changes that will be implemented as part of the settlement, and under the settlement will receive meaningful assistance from Quiznos in locating sites, as well as having their status as SNO franchise owners actively monitored by Quiznos.) The SNO Class Members who have chosen to exit the Quiznos System will get sizeable cash refunds, either 32.7%, 10% or 5% depending on when they signed franchise agreements (which affects the viability of possible defenses to SNO Class Members' claims). Settlement benefits extend even to SNO Class Members who have signed releases; they get either $500 (if they received no consideration previously) or $250 (if they did receive some kind of consideration).

Franchise Operator Class Members receive substantial financial benefits as well. Those who have stopped operating their stores as of the Preliminary Approval Date receive $1,700. Those who transferred their stores to other franchisees (which involved the signing of a release) receive $475, and franchisees in business as of the Preliminary Approval Date receive $3,100 in credits toward food purchases.

Class Members in both groups benefit significantly from releases that Quiznos that Quiznos will grant as part of the settlement. SNO Class Members who exit the system and

Franchise Operator Class Members who have gone out of business will be released from claims for lost future royalties for the unexpired terms of their individual franchise agreements.[10]  Mr. Schaeffer estimates the present value of these releases is $66,452,037.  (Schaeffer Report, pgs. 29-31, Confidential Schaeffer Decl. ¶ 2 and Exh. A.)  In addition, all existing claims that Quiznos had for unpaid royalties, marketing fees, or advertising fees as of April 30, 2009 will be released.  Pursuant to Mr. Schaeffer's analysis, the present value of these releases is approximately $4,824,784.  (*Id.* at pg. 28.)

The business changes that Quiznos will make under the Settlement Agreement have been discussed in detail above.  No individual lawsuit could ever have required Quiznos to make any of these changes require it to spend $19,400,000 on marketing and advertising, with $10,000,000 targeted to local advertising.  Certainly no lawsuit could ever have compelled Quiznos to recognize an IAOF and to provide significant funding to incorporate that organization and get it up and running.  What the franchisees ultimately make of the IAOF, only the future can tell. There can be no doubt, however, that the Settlement Agreement has created an opportunity that could prove to be incredibly valuable to Quiznos' franchisees in the coming years and give them a legitimate voice in which to address their going-forward concerns.

Mr. Schaeffer's report provides what is likely the best argument for approving the settlement; even though its methodology is conservative, it assesses the value of the settlement's provisions at more than $206 million.  It does so by ascribing minimal quantifiable economic value—less than $200,000—to one of the changes most likely to have a significant positive impact on the Quiznos System:  namely, the creation of the IAOF.  Furthermore, Mr. Schaeffer's analysis, like Attorney Suwanski's article, recognizes the significance to franchisees and potential franchisees of the increased transparency of the Quiznos FDD and the annual pricing

---

[10] The Quiznos franchise agreement typically has a 15-year term.

review mandated by the Settlement Agreement. The Franchise Operator cases were fundamentally about Quiznos' failure to fully and accurately disclose the nature of Quiznos' supply distribution model. Like the advertising contributions, these substantial benefits could never have been realized through individual litigation.

Finally, the settlement allows those putative class members who believe their claims are more valuable to take the ultimate step of exercising their right to opt out and pursue those claims. And indeed, 239 class members did exactly that. This is how the process is supposed to work. "A settlement is fair to the plaintiffs in a substantive sense . . . if it gives them the expected value of their claim if it went to trial, net of the costs of trial[]." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 682 (7th Cir. 1987). Here, the simple fact is that had the litigation run its course, it was extremely unlikely that any of the cases would have gone to trial as a class action. In this light, the settlement, worth $206 million measured conservatively, far exceeds the likely result of any trial in these four cases. The first factor weighs overwhelmingly in favor of approval.

### B.  The Complexity, Length, And Expense Of Further Litigation.

Even after years of litigation, dozens of depositions, millions of pages of document discovery, $1,212,112.10 in litigation costs and expenses and $6,504,195.83 in attorney time ***on the plaintiffs' side alone***, all of the cases comprising the Franchise Operator Class Action Litigation were only at the motion to dismiss stage.[11] Had plaintiffs' claims survived those motions, at least 100 more depositions were likely. None of those cases had proceeded to the stage of expert reports and depositions of those experts, even though Class Counsel had already

---

[11] The amount attributed to litigation expenses includes all of them, not just those from which we now seeks reimbursement. (Goode Decl. ¶¶ 22-27 and Exhs. J, K-1, K-2, and L; Klein Decl. ¶¶ 19-21 and Exhs. J, K, L-1, and L-.) It also totals all professional time in the case and does not deduct the $163,000 paid in fees and accounted for below in calculating the lodestar. (Goode Decl. ¶¶ 10-14; Klein Decl. ¶¶ 7-8.)

retained and utilized consulting experts who provided critical analysis necessary to leverage the results achieved. In these complex cases, experts would have addressed causation and damages, the economics of franchise supply chains, restaurant management and operation, and other significant issues.

As this Court well knows, lay and expert discovery in contemporary federal litigation is inevitably followed by motions for summary judgment. Only the *Bonanno Action* had reached the summary judgment stage, and even there the motion had not been fully briefed at the time of settlement. In the Franchise Operator Class Action Litigation had it continued, full briefing on summary judgment likely would have taken four to five months in each case, and because federal dockets are crowded, decisions on these motions, with a complicated and extensive factual record and legally complex RICO claims, could have taken six months or more after the completion of briefing.

And then, if plaintiffs defeated the summary judgment motions, trial awaited. Even a trial narrowed by summary judgment likely would have taken at least 6-8 weeks. For example, issues in a franchise operator trial would have included:

- The creation and rapid expansion of the Quiznos System;

- The decisions of Quiznos ownership to take the company private;

- The sales pitches used to foster the system's explosive growth;

- The economics and profitability of Quiznos' supply chain system;

- The circumstances of individual plaintiffs' business success or failures; and

- Quiznos' counterclaims against franchisees who had gone out of business.

Trials of course would have been preceded by extensive motion practice surrounding admissibility of evidence, whether the case would be tried to a jury or the court, the enforceability of Quiznos' contractual limitations on damages and other restrictions, and similar issues.

It is no exaggeration to say that this settlement will save the parties and the judicial system millions of dollars in dispute processing costs and thousands upon thousands of hours of time of legal professionals and court employees. This fact weighs heavily in favor of approval.

### C.     The Presence Of Collusion Between The Parties.

Some class action settlements look suspiciously collusive because they are reached shortly after filing, before plaintiffs' counsel has invested much time or money in the prosecution of the cases. That certainly is not the case here. These cases have been vigorously litigated from the start, with Quiznos moving to dismiss, plaintiffs responding with not only extensive briefs but amended complaints asserting new facts and legal theories, and extensive discovery by both sides.

Even settlement proved to be a difficult road to tread. Settlement talks began in April 2008, with negotiations to choose a mediator and work out logistics occupying the summer months of that year. Ultimately, counsel and client representatives met with a retired federal judge, the Honorable Dickran Tevrizian, in Los Angeles for three days, and continued negotiations in a one-day session two weeks later. Unfortunately, these sessions did not resolve the case and the parties resumed all-out litigation.

The next spring, after Judge Arguello's decision enforcing the class action bar, the parties again explored the idea of mediation, and another session was scheduled for July 2, 2009 in Denver, this time with Attorney Michael O'Donnell of Wheeler Trigg & O'Donnell, LLP.

(Kravit Decl. ¶¶ 2, 5.)  Although substantial progress was made, the negotiations did not result in a finalized settlement acceptable to both sides.  (Kravit Decl. ¶ 6.)  A second all-day mediation was held in Denver on August 7, 2009, and those negotiations moved the parties even closer to a completed deal.  (Kravit Decl. ¶ 6.)  The issue of attorney fees was raised at the July 2009 mediation but not resolved until substantive agreement on deal terms had been reached in early October 2009.  (Kravit Decl. ¶ 7.)  Negotiations were finally concluded with the execution of the Settlement Agreement on October 27, 2009.

Both Judge Tevrizian and Attorney O'Donnell have affirmed that they observed no collusion in the settlement negotiations.  (Tevrizian Decl. ¶ 7 [Dkt. 166]; O'Donnell Decl. ¶ 7 [Dkt. 164].)  Nor is there a shred of evidence that could support a conclusion that this settlement was collusive.  The representative plaintiffs and Class Counsel tenaciously pursued their claims and Quiznos mounted an aggressive defense.  All four suits were hotly contested, with motion practice attacking the legal basis of each complaint and extending to the discovery process. Settlement only gathered momentum after the district court in the *Bonanno Action* enforced the contractual class action bar and the Tenth Circuit refused to hear the case on an expedited basis. The settlement, in short, was the product of arm's length bargaining base, like on all settlements, on the facts and legal outcome before the settling parties.

### D.    Opinion of Competent Counsel.

Attorneys Kravit, Leitner, Goode, Marks and Klein have been approved to represent the settlement classes.  Collectively they have decades of experience litigating high-stakes matters such as these cases.  (11/18/10 Leitner Decl. ¶¶ 2-15 [Dkt. 151]; Klein Decl. ¶¶ 2, 14, 17-18; and Exh. I; Goode Decl. ¶ 22 and Exh. I.)  After weighing the pros and cons of settlement and litigation, and investing millions of their firms' time in prosecuting the class claims, Class

Counsel have determined that the settlement is fair and reasonable. This opinion is supported by the favorable view of the settlement expressed in Attorney Jillian Suwanski's *Lexology* article. (Goode Decl. ¶ 28 and Exh. M.)

There is no suggestion anywhere in this record that Class Counsel were unwilling or unable to bring these cases to trial, had that been the most reasonable and prudent course of action. For the reasons discussed in detail above, it was not. The choice of settlement over continued litigation was not collusive and therefore supports approval.

### E.    The Reaction Of Class Members To The Proposal.

The class action administrator mailed claim form packets to 8,468 current and former Quiznos franchisees. Only the Gevaarts filed an objection to the settlement.[12] In addition, 239 franchisees chose to opt out. Thus, only 2.8% of class members—the lone objector plus the opt outs—have affirmatively refused to participate in the settlement. Although not as high as the 99.9% acceptance rate in *Mexico Money Transfer*, this 97.2% acceptance rate does likewise serve as "strong circumstantial evidence in favor of the settlements." 164 F. Supp. 2d at 1021.

The participation rate of 26.6%—2,254 out of 8,468 Class Members who were sent claim forms returned them to the administrator—also supports approval. As a court in this district has noted, class member response rates are frequently below 20% when individuals are required to take affirmative steps, such as submitting claim form, in order to obtain the benefits of a class

---

[12] The Gevaarts were the only Class Members to file an objection that complied with the procedure established by this Court's November 20, 2010 Order. Two other Class Members, however, lodged improper objections, which should be disregarded for that reason alone. Moreover, one of those class members, Linda Cassell, who wrote directly to the Court on January 4, 2010 has withdrawn her objection. (2/18/10 McFarland Letter, Goode Decl. ¶ 31 and Exh. O.) In any event, both of the improper objections are substantively meritless. The Yeon "objection," sent to the clerk of this Court and dated January 19, 2010, is simply a complaint that the settlement did not provide enough monetary compensation; if the Yeon Group wanted more money they could have opted out and filed their own suit. Likewise, the Cassell letter expresses dissatisfaction with the amount of the settlement and also, somehow, that the case was brought as a class action. Neither is a proper legal ground for objection.

action settlement. *Henry v. Sears Roebuck & Co.,* 1999 WL 33496080 at *10 (N.D. Ill., July 23, 1999). However, in this instance, the response rate is in fact notably higher.

In addition, the substantive weakness of the Gevaarts' objection must also be considered in evaluating the Class Members' reaction to settlement. Most significantly, the Gevaarts' misrepresent to this Court the benefits provided in the form of Quiznos' release of future royalty claims by simply ignoring the existence of the release. To the Gevaarts alone, this release is worth hundreds of thousands of dollars, and to the class members in the aggregate, it is worth more than $66 million.

### F.       The Stage Of Proceedings And Discovery Completed.

As noted above, this is not one of those class actions that was settled shortly after filing in an effort to enrich plaintiffs' counsel at the expense of the class. Plaintiffs had to clear the initial hurdles posed by motions to dismiss, and after losing one of those (before Judge Griesbach) successfully resurrected their claims by moving for and winning reconsideration. Even though motions to dismiss were filed, plaintiffs successfully argued against Quiznos' efforts to stay proceedings while those motions were pending, and after being granted the right to discovery they pursued it aggressively.

We have pointed out several times the millions of pages of documents produced by Quiznos (and reviewed by Class Counsel), the 80 depositions taken in these cases and the 67 third party subpoenas (and related motion work) pursued by Class Counsel. Indeed, plaintiffs' discovery from those third parties, ranging from former Quiznos employees to Quiznos suppliers and distributors, to investors that had considered the possibility of acquiring Quiznos, proved invaluable. Plaintiffs truly left no stone unturned in their quest for facts that might help support

their claims. The extensive investments of time and money in the cases by both sides support approval.

III. **THIS COURT SHOULD APPROVE THE INCENTIVE PAYMENTS TO THE REPRESENTATIVE PLAINTIFFS AND TSFA MEMBERS, THE ATTORNEY FEES, AND THE LITIGATION COSTS AND EXPENSES.**

A. **The Incentive Payments Are Reasonable.**

The Settlement Agreement calls for two categories of incentive payments: payments to the representative plaintiffs ($12,500 for those in the *Bonanno Action*, and $50,000 for those in the Franchise Operator Class Action Litigation) and "Exhibit L Incentive Awards," paid to persons who contributed funds to assist in prosecution of the cases and made themselves available to Class Counsel as factual and strategic resources as the lawsuits progressed. (10/27/09 Settlement Agreement, Section X, 11/18/09 Motion Exh. A.)

Both classes of incentive awards are reasonable and should be approved. The payments to representative plaintiffs pale in comparison to the $303,000 incentive awards approved by the district court in *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001). Other courts have likewise readily approved awards higher than the $50,000 sought here. *See e.g., In re Revco Sec.Litig.*, 1992 WL 118800 (N.D. Ohio 1992) and 1993 WL 497208 (N.D. Ohio 1993) (approving $200,000 incentive award); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 203-04 (S.D.N.Y. 1997) (approving $85,000 incentive award). Still other decisions have approved incentive payments equal to the $50,000 proposed here. *E.g., In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) ($55,000); *Van Vraken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D. Cal. 1995) ($50,000); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) ($50,000).

*DeSantis v. Snap-On Tools Co., LLC*, 2006 U.S. Dist. LEXIS 78362 at *34-35 (D.N.J., Oct. 27, 2006) ($50,000).

The Seventh Circuit has established the criteria for evaluating an incentive award: "[T]he actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). In the same case, the Court of Appeals affirmed the incentive award because, "[m]ost significantly, the special master found that, in filing the suit, Cook reasonably feared workplace retaliation." *Id*.

Measured against these criteria, the $50,000 incentive awards are well within the range of reasonableness. First, plaintiffs have obtained substantial benefits for the class. As shown above, the Class III members who get the smallest payments and do not benefit from system-wide improvements get releases from what in most instances are hundreds of thousands of dollars in potential liability for lost future royalties and other payments. The Class I members get not only the food credits specified in the settlement, but $19 million worth of additional advertising spending, and substantial beneficial changes to the Quiznos System, including the establishment of an independent franchisee association, direct franchisee input to advertising decision makers, independent third-party review of system food and supplies pricing, a formal grievance resolution procedure, and many more significant positive changes to their business relationship. Especially in light of the significant blow dealt to all the class claims by Judge Arguello's class certification decision in the *Bonanno Action*, the results achieved by the plaintiffs are impressive and warrant a substantial reward.

Second, the plaintiffs invested substantial time and effort working with the attorneys on investigation and litigation strategy, preparing for traveling to depositions and being deposed,

and participating in written discovery and document production.  These contributions are summarized in Section X of the Settlement Agreement.

Third, the plaintiffs reasonably harbored fears that they would suffer from retaliation at Quiznos' hands.  Although we found no cases approving incentive fees in franchise class actions on this basis, the fear of retaliation is often cited in employment discrimination class actions, which are strongly analogous to the franchise context because of the vulnerability of franchisees in a continuing relationship with a franchisor:  "In discrimination-based litigation, the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril."  *Roberts*, 979 F. Supp. at 201.

Here, the representative plaintiffs had concerns that Quiznos would pursue them for taking a public stand in court against the company.  (Campbell Decl. ¶¶ 5-6 [Dkt. 161]; Grachan Decl. ¶ 3 [Dkt. 162].)  Some had firsthand experience with what they considered aggressive conduct by Quiznos.  Charles Grachan was told that his franchise would be terminated if he closed his store over the Fourth of July (Grachan Decl. ¶ 2 [Dkt. 162]), while John Schodron had previously been sued by Quiznos for allegedly defaming the company in comments posted on a message board.  (Schodron Decl. ¶¶ 4-7 [Dkt. 165].)

Quiznos' litigation history also was significant to plaintiffs as they considered whether to join the lawsuits.  Anthony Bonanno feared a claim for lost future royalties, which fear ultimately came true when Quiznos counterclaimed against Mr. Bonanno (and the other class representatives in the Bonanno Action) and he had to report the claim to regulatory authorities because of his employment in the financial services industry.  (Bonanno Decl. ¶¶ 5-7 [Dkt. 160].)

Michael Campbell heard about the lawsuits Quiznos filed in 2006 against franchisees like John Schodron who had posted criticisms of Quiznos on a message board. (Campbell Decl. ¶ 3 [Dkt. 161].)

Also significant to the plaintiffs was Quiznos' December 2006 termination of the franchises of the Board of Directors of the TSFA, an organization formed to express concerns of member franchisees, after the TSFA posted the suicide note of Bob Baber, a former Quiznos franchisee, on its website. (Campbell Decl. ¶ 4 [Dkt. 161].) Quiznos then sued the board members (and the board members filed their own suit), and a federal district court in Denver ultimately enjoined the terminations, noting that "Quiznos house counsel Meyers made clear in his testimony that Quiznos's actions in terminating TSFA board members' franchises were purely punitive." *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1251 (D. Colo. 2007).

Quiznos unquestionably views its litigation history as legitimate efforts to protect its legal rights and maintain the integrity of its franchise system. This Court need not decide who was right in these franchisor-franchisee battles, any more than it must conclusively decide the merits of the substantive claims and defenses as a condition of approving the settlement in this case. The point is simply that the representative plaintiffs did exceptional work on behalf of the classes they represent, stuck their necks out to assist the masses, and should be rewarded for their efforts.

Likewise, the $500,000 sought to be distributed to those on Exhibit L of the Settlement Agreement represent nothing more than repayment of funds contributed to help the pursuit of a collective goal—achievement of justice for Quiznos franchisees. These contributors will also receive a small pro rata payment as compensation for their financial sacrifice during the litigation (e.g. essentially a time value of money payment). Approval of those incentive payments will

have the salutary effect of encouraging putative class members to support collective action even when they are not plaintiffs, thus enhancing the effectiveness of the class action as a public policy tool for achieving positive change.

###### B. The Attorney Fees And Litigation Costs And Expenses Sought By Class Counsel Are Reasonable.

By any measure, the $10 million attorney fee and the $810,425.27 in costs and expenses for which Class Counsel seeks reimbursement are reasonable compensation for the substantial efforts of Class Counsel in pursuing those cases and effecting this settlement. There are several analytical approaches for judicial evaluation of attorney fees in class action settlements. First is what has become known in this District as "the McGarr benchmark" of 30% of the value of the settlement. *See, e.g., Mex. Money Transfer*, 164 F. Supp. 2d at 1033; *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (affirming district court's approval of 30% fee based in part on survey of 13 Northern District of Illinois decisions approving fees between 30% and 39%). Using the concededly conservative valuation of $206,000,000 by Mr. Schaeffer, a fee of about $60 million would be justified using the McGarr benchmark. The agreed-upon fee provided by the Settlement Agreement is well under this threshold, and should be approved for that reason alone.

A second approach evaluates the time logged by counsel in pursuing the case at hourly billing rates, which is known as the "lodestar," then considers the extent to which a risk multiplier should enhance the lodestar amount. *See, e.g. Purdy v. Security Savs. & Loan Ass'n*, 727 F. Supp. 1266, 1277-79 (E.D. Wis. 1989). Indeed, the Seventh Circuit has held that it is reversible error for a district judge to refuse a risk multiplier to successful class counsel "in a case in which the lawyers had no sure source of compensation for their services." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992). The risk multiplier simply simulates market

compensation for contingent fee cases by enhancing a lawyer's rate proportionately to the risk he will lose and receive nothing. "The need for such an adjustment is particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent." *Id.*

Here, the basis for the lodestar amounts are the regular (and reasonable) hourly rates of KHK and M&K.[13] Those rates are set forth in the Declarations of Joseph S. Goode (¶¶ 2-7, 9-22 and Exhs. A-I) and Justin M. Klein (¶¶ 2-5, 7-18 and Exhs. A-I). They are reasonable rates, both by virtue of the fact that the two firms charge and collect those rates for hourly work on similar matters, and because they are comparable to prevailing rates in the geographic regions where the firms practice. (Goode Decl. ¶¶ 18-22 and Exhs. H-1 to H-5 and Exh. I; Klein Decl. ¶¶ 12-18 and Exh. I; Kravit Decl. ¶ 8.)

The total amount of fees billed on an hourly basis by the firms is set out in detail in the Goode and Klein Declarations (and in the exhibits to those declarations) and is summarized here:

| | KHK | M&K | WHD |
|---|---|---|---|
| *Bonanno Action* | $837,518.50 | $738,507.58 | $0.00 |
| *Westerfield Action* | $437,930.75 | $108,568.00 | $125,401.00 |
| *Brunet Action* | $2,194,427.75 | $400,432.75 | $0.00 |
| *Siemer Action* | $792,203.00 | $117,943.00 | $0.00 |
| *New Jersey Action* | $325.00 | $23,971.00 | $0.00 |
| *California Action* | $0.00 | $6,671.00 | $0.00 |
| *McDonald Action* | $95,451.00 | $35,898.00 | $0.00 |
| *General TSFA Matter* | $0.00 | $588,947.50 | $0.00 |
| **Lodestar Subtotal** | $4,357,856.00 | $2,020,938.83 | $125,401.00 |
| **Fee Credits on Account** | $63,750.00 | $93,250.00 | $6,000.00 |
| **Net Lodestar** | **$4,294,106.00** | **$1,927,688.83** | **$119,401.00** |
| **Calculation Lodestar** | | | **$6,341,195.83** |

---

[13] It also includes $119,401.00 of lodestar time of Whyte Hirschboeck Dudek S.C. ("WHD"), where Mr. Goode and Mr. Leitner worked on the *Westerfield Action* before moving to KHK on February 5, 2007. (Goode Decl. ¶¶ 9-12 and Exh. A.).

Thus, the lodestar based on the firms' hourly rates is $6,341,195.83. Dividing this total into the agreed-upon $10 million fee yields a risk multiplier of 1.57. This is well within the range that has been approved by courts using the risk multiplier/lodestar methodology. *See Purdy*, 727 F. Supp. at 1277-79 (approving risk multiplier of 2.0); *Matter of Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 132 (N.D. Ill. 1990) (approving multipliers between 2.5 and 1.5).

Under both of the prevailing approaches to attorney fee awards in class actions, the $10 million fee here is more than reasonable. Therefore, this Court should approve it.

### C.    The Costs And Expenses Are Reasonable.

Plaintiffs incurred (and seek reimbursement of) a total of $810,425.27 in litigation expenses and costs pursuing this litigation that has not been reimbursed from other sources. This does not include the $401,686.83 paid by the LAP. (Zazzaretti Decl. ¶ 2 and Exh. A.) (Goode Decl. ¶¶ 25-27 and Exhs. K-1 to K-2 and L; Klein Decl. ¶¶ 20-21 and Exhs. K and L-1 to L-2.) These expenditures include, but are not limited to, expert witness and consulting expert fees, document database charges, travel and lodging expenses, electronic research, deposition transcripts, mediation expenses, and other expenses reasonably and necessarily incurred for the benefit of the Class. (Goode Decl. ¶¶ 23-27; Klein Decl. ¶¶ 19-21.) The specific items included in this total sought for reimbursement are identified in Exhibits K-1, K-2, and L to the Goode Declaration and Exhibits K, L-1 and L-2 to the Klein Declaration.

In the Settlement Agreement, Quiznos agreed to pay a maximum of $1 million for documented costs and expenses of the litigation. The $810,425.27 total in costs and litigation expenses are reasonable, were incurred directly for work on these cases, and are well within the $1 million cap. They should be approved.

## CONCLUSION

For the reasons set forth above and those previously stated on the record, the proposed settlement warrants this Court's final approval.

Dated this 23rd day of June, 2010.

KRAVIT HOVEL & KRAWCZYK S.C.

*s/ Mark M. Leitner*
Stephen E. Kravit, Esq.
Joseph S. Goode, Esq.
Mark M. Leitner, Esq.
825 North Jefferson Street
Milwaukee, Wisconsin  53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135
*Attorneys for Plaintiffs*

*s/ Justin M. Klein*
Gerald A. Marks, Esq.
Justin M. Klein, Esq.
Marks & Klein, LLP
63 Riverside Avenue
Red Bank, New Jersey  07701
Telephone:  (732) 747-7100
Facsimile:  (732) 219-0625

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

justin@marksklein.com

Jerry@marksklein.com

lmacphee@perkinscoie.com

goode@kravitlaw.com

amy.haywood@chengcohen.com

fredric.cohen@chengcohen.com

sshepherd@sfmslaw.com

*s/ Mark M. Leitner*
Mark M. Leitner, Esq.
Kravit, Hovel & Krawczyk, S.C.
825 North Jefferson Street
Milwaukee, Wisconsin 53202
Telephone: (414) 271-7100
Facsimile: (414) 271-8135